STATE of Iowa, Appellee,

v.

**Darla COUNTRYMAN, Appellant.**

No. 96–1220.

Supreme Court of Iowa.

Dec. 24, 1997.

**556**

Patricia M. Hulting of Roehrick, Hulting, Blumberg, Kirlin & Krull, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan Horvat, Assistant County Attorney, for appellee.

Considered by HARRIS, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

HARRIS, Justice.

This first-degree murder prosecution arose from the particularly savage killings of two elderly Des Moines sisters during a crudely inept robbery. The defendant and her husband were both charged with the killings, and she appeals following her conviction of first-degree murder in violation of Iowa Code section 707.2 (1995). Because we find no merit in any of the defendant's four assignments of error, we affirm.

The victims, eighty-three-year-old Madelyne Miletich, and her sister, seventy-seven-year-old Dorothy Miletich, shared a Des Moines apartment. They were befriended by defendant Darla Countryman and her husband Ray Countryman. Ray was a maintenance worker for the apartment complex. On June 15, 1995, the two sisters were packing their belongings in anticipation of their planned move to Missouri. Darla invited the two sisters to spend the night in the Countryman quarters in the complex, rather than in a local hotel. Notwithstanding a reservation the sisters had made there, they did not appear at the hotel and were not thereafter seen alive.

Six days later, on June 21, Darla and Ray left Des Moines in their pickup truck and drove to Nebraska where they stole a car. The next day Darla was found aimlessly wandering, confused and incoherent, in Morris County, Kansas, on a farm owned by Rex and Susan Osborne.

Rex Osborne summoned authorities and Darla was taken by deputy sheriff Scott Coover to the sheriff's office where she spoke extensively with Vicki Hewitt, a police dispatcher. Hewitt did not understand the conversation as an inquiry into a crime, but rather as an effort to learn about Darla's identity. The conversation lasted from 11:30 p.m. on June 22 to approximately 2:15 a.m. on June 23. During this entire time Darla was not advised of her *Miranda* rights. Hewitt thought Darla appeared to be under the influence of drugs. Darla stated she saw little aborigine men and little black bugs crawling on the walls and heard them speaking to her.

During the conversation Darla stated she had stolen a car. She also told of her family in Iowa, various run-ins with the law, blood in her apartment, Darla's mother's missing property, drug use, and possession of savings bonds. Darla provided no directly incriminating evidence concerning the murder, but did express concern for the Miletich sisters, mentioning that something bad had happened to them.

On the basis of a separate investigation conducted by the sheriff's department, Darla was arrested for the theft of the car she and her husband had stolen in Nebraska. The

car was seized and its search revealed more than $100,000 in bonds belonging to the Miletiches as well as checkbooks and credit cards. Other items found in the car included wigs, new clothes, several purses, and notes that Darla and Ray had written during their drive.

On June 25 Darla spoke with Coover after giving her warnings as required by *Miranda v. Arizona*, 384 U.S. 436, 473–76, 86 S.Ct. 1602, 1627–29, 16 L.Ed.2d 694, 723–25 (1966).[1] At the same time Darla signed a written waiver of those rights. She stated she had stolen a car and had been taking drugs. On June 26, after again being informed of her *Miranda* rights and signing a waiver, Darla was questioned again, this time by Madison County deputy sheriff Craig Busch and special agent David Button of the Iowa division of criminal investigation. Darla told the officers about the death of the Miletich sisters and provided a written statement.

On June 27, less than twenty-four hours from the previous interrogation, the same officers initiated a conversation with Darla. This time they did not formally readminister the *Miranda* warnings, but reminded her of them. The purpose of the interview was to learn whether Darla remembered anything from the previous day. During this episode Darla again made inculpatory statements.

After she was charged with murdering the Miletich sisters, Darla raised a number of pretrial and trial issues which will be discussed in the divisions that follow.

I. Darla challenges the district court's refusal to suppress evidence regarding statements she made during four interviews: (1) statements to Vicki Hewitt on June 22–23; (2) statements to Coover on June 25; (3) statements to Busch and Button on June 26;

and (4) statements to Busch and Button on June 27.

■■■ Our review of the district court's refusal to suppress Darla's statements is de novo. *State v. Smith*, 546 N.W.2d 916, 920 (Iowa 1996). We nevertheless give weight to fact findings because of the district court's opportunity to assess the credibility of witnesses. *State v. Morgan*, 559 N.W.2d 603, 608 (Iowa 1997). We consider both the evidence from the suppression hearing and that introduced at trial. *State v. Jackson*, 542 N.W.2d 842, 844 (Iowa 1996). We utilize a dual test in determining the admissibility of a defendant's inculpatory statements over a fifth amendment challenge. *State v. Davis*, 446 N.W.2d 785, 788 (Iowa 1989). We first determine whether *Miranda* warnings were required and, if so, whether they were properly given. *Id.* Second, we ascertain whether the statement is voluntary and satisfies due process. *Id. Miranda* warnings are not required unless there is both custody and interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144, 82 L.Ed.2d 317, 328 (1984); *Davis*, 446 N.W.2d at 788. So the question becomes whether Darla was in custody of law enforcement officers at the time.

■ The custody determination depends on the objective circumstances of the interrogation, not on subjective views harbored either by the officer or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 298 (1994). The *Stansbury* court explained:

In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there was 'a formal arrest or re-

[1] The warning consisted of the following:
You have the right to remain silent.
Anything you say can be used against you in a court of law.
You have the right to talk to a lawyer for advice before you are questioned, or to have him present with you while you are being questioned.
If you cannot afford a lawyer, one will be appointed for you before you are questioned if you wish.

If you choose to answer questions now without a lawyer present, or before you contact a lawyer for advice, you will still have the right to stop answering at any time, and to talk to a lawyer for advice before further questioning or to have him present before further questioning. You may refuse to answer any question, but any answers you give during this time can be used against you in court.

straint on freedom of movement' of the degree associated with a formal arrest." *Id.* (quoted sources omitted). We utilized this objective test in *State v. Scott,* 518 N.W.2d 347, 350 (Iowa 1994).

In *State v. Deases,* 518 N.W.2d 784, 789 (Iowa 1994), we said the appropriate test was "whether a reasonable person in the [defendant's] position would understand himself [or herself] to be in custody." We went on to adopt a four-factor test as guidance in making such a determination. *Id.* These factors include: (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning. *Deases,* 518 N.W.2d at 789. This test was again utilized in *Smith. Smith,* 546 N.W.2d at 922.

When these four factors are applied to the facts here, it does not objectively appear that Darla was in custody during her conversation with Hewitt. Although confused, Darla must have understood that she was being rescued, not arrested, when she voluntarily accompanied Coover to the sheriff's office. The discussion there with Hewitt was to explore Darla's identity so that relatives and friends could be called.

The three-hour length of the conversation did not render it custodial. *See State v. Brown,* 341 N.W.2d 10, 16 (Iowa 1983) (two and one-half hours of questioning not custodial). A three-hour conversation might sometimes be considered long, but not on these facts. This conversation was interrupted several times for bathroom breaks and for trips to the refrigerator for juice. Hewitt, the only other person in the room, was not confrontational or aggressive in her questioning. Hewitt was a civilian employee whose training was in crisis intervention rather than interrogation or law enforcement techniques. Her kindness and reputation in the department for providing a sympathetic ear was the sole purpose for her being chosen to question Darla.

Another factor is the extent to which a defendant is confronted with evidence of guilt. *See Smith,* 546 N.W.2d at 925. Abso-

lutely no evidence was presented to Darla concerning her involvement with the murders. Hewitt and the law enforcement officers in fact knew nothing about the Miletich murders at the time.

The final consideration in determining whether custody existed "is the degree to which a reasonable person in the situation of the defendant would believe he [or she] was free to leave." *Id.* On this element we weigh the degree of physical restraint imposed during the interrogation. *Id.; see State v. Kasel,* 488 N.W.2d 706, 708–09 (Iowa 1992) (finding custody when a defendant was forcefully returned to an interrogation room after attempting to leave); *Brown,* 341 N.W.2d at 16 (finding no custody when a defendant was subject to no physical restraint and felt free to leave at any time). There is no indication Darla was restrained. Although Darla never asked to leave, Hewitt testified she would have first tried to talk her out of it for her own safety, but would have eventually allowed her to leave if she insisted.

Because Darla was not in custody, the district court was correct in denying her motion to suppress testimony regarding the Hewitt conversation on the basis of *Miranda.*

II. Darla challenges testimony of her three-hour conversation on the separate claim it was involuntary. On this issue the State must show by a preponderance of the evidence that the statements were voluntarily given. *State v. Payton,* 481 N.W.2d 325, 328 (Iowa 1992). We employ the totality-of-circumstances test in determining voluntariness: it must appear the statements were the product of "an essentially free and unconstrained choice, made by the defendant whose will was not overborne or whose capacity for self-determination was not critically impaired." *Id.*

Darla rests this challenge on her claim to have been under the influence of drugs, citing *Townsend v. Sain,* 372 U.S. 293, 308–09, 83 S.Ct. 745, 754–55, 9 L.Ed.2d 770, 783 (1963) (confession is involuntary when induced by police administering "truth serum"). *Townsend* is no authority under the facts here. It was of her own volition that Darla ingested any drugs affecting her. The

fifth amendment's guarantees do not "protect a defendant from his [or her] own compulsions or internally-applied pressures which are not the product of police action." *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir.1993).

Although Darla does seem to have been under the influence of drugs and was confused, she was easy to understand. She was responsive to Hewitt's request for information about her name and where she was from. She seemed conscious of the meaning of her words and able to appreciate the nature and consequences of her statements. She was in full control of her person, capable of getting up, walking around, going to the bathroom, and getting orange juice when she chose, all without assistance. In short the evidence does not show that Darla's mental state was so disabling as to render her unable to make a voluntary statement, or that she was unduly susceptible to manipulation by Hewitt.

Darla was not affected to the degree experienced by the accused in *State v. Edman*, 452 N.W.2d 169 (Iowa 1990). The officer questioning Edman considered him as intoxicated as any person he had ever seen. We found the driver's statement was nevertheless voluntary and admissible. *Id.* at 171; *see also State v. Wilson*, 264 N.W.2d 614, 614–15 (Iowa 1978) (defendant's inculpatory remarks admissible though his eyes were glassy and he looked a "little spacey," and appeared drowsy); *State v. Rank*, 214 N.W.2d 136, 139 (Iowa 1974) (defendant's incriminating statements admissible despite uncontroverted evidence that he was "high" on a controlled substance).

The State has established that Darla's statement was voluntary and admissible. Darla's contention to the contrary is without merit.

█ III. Darla challenges the statements she made to Coover during a twenty-five minute conversation on June 25, almost three days after she was found at the Osborne farm. By this time Coover knew of the Miletich murders. Darla denied even knowing the Miletich sisters.

Prior to this inquiry Darla signed a written waiver after Coover had read her *Miranda* warnings and had received an oral waiver. Darla contends the waiver was not knowing, intelligent, and voluntary because she was still under the influence of drugs. She denies remembering the conversation and contends this failure belies the voluntary and knowing nature of a waiver. She however admits recalling the conversation with Hewitt three days earlier.

█ Once the issue of the validity of an alleged waiver of constitutional rights is raised, the State must prove by a preponderance of the evidence that the waiver was knowingly, intelligently, and voluntarily given. *Morgan*, 559 N.W.2d at 606; *State v. Vincik*, 398 N.W.2d 788, 789 (Iowa 1987). The relinquishment of the right must be voluntary, that is it was not given as a result of intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421 (1986). In *Colorado v. Connelly*, 479 U.S. 157, 169–70, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 486 (1986), it was explained that "voluntariness" for fifth amendment due process purposes and *Miranda* purposes are identical. Thus a *Miranda* waiver is involuntary only when it is shown to be the product of police misconduct or overreaching. *Connelly*, 479 U.S. at 169–70, 107 S.Ct. at 523, 93 L.Ed.2d at 486. The waiver must also have been "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421, 106 S.Ct. at 1141, 89 L.Ed.2d at 421. Thus a waiver can be found voluntary under the *Connelly* criteria although the suspect's mental infirmities might preclude him from making a rational choice; that is the rights must be surrendered knowingly and intelligently. This is determined by examining the totality of the circumstances surrounding the interrogation. *Id.* A written waiver of constitutional rights is not alone sufficient to establish the waiver as knowing, intelligent, and voluntary. *Vincik*, 398 N.W.2d at 789. It is however usually strong proof of its validity. *Fryer v. State*, 325 N.W.2d 400, 409 (Iowa 1982).

This argument also fails. It is unlikely the use of drugs, which three days earlier did not render Darla's statements involuntary, could

have had such an influence on her after three days. Other factors also suggest a proper waiver of her *Miranda* rights. Coover said that when he read her the *Miranda* warnings, she did not appear to have any trouble understanding his questions and had no difficulty answering them. He denied making threats or promises which would have intimidated or influenced Darla.

The record is wholly devoid of any suggestion that police resorted to physical or psychological pressure to elicit the waiver. Darla was not worn down by an abuse of interrogation tactics, lengthy questioning, or by trickery or deceit. Coover's attempt to obtain a waiver was free from the abuses that concerned the *Miranda* court. *See Fare v. Michael C.*, 442 U.S. 707, 726–27, 99 S.Ct. 2560, 2572–73, 61 L.Ed.2d 197, 213 (1979). The State has sufficiently satisfied its burden of proving Darla knowingly, intelligently, and voluntarily waived her *Miranda* rights.

▮ IV. Darla makes a separate general involuntariness claim on this issue as well. It is based on the same point she urged on her claim that her *Miranda* waiver was not constitutional: she was under the influence of a controlled substance at the time. We reject the claim for the same reasons we rejected that claim. The assignment is without merit.

▮ V. Darla's claim that her statements to Busch and Button should have been suppressed suffer the same fate. Before beginning the questioning in the kitchen area of the sheriff's office on June 26, Button read her *Miranda* warnings and again Darla indicated she understood her rights and agreed to speak with the officers. During the interrogation Darla made several incriminating statements and provided a written statement. Darla claims Button promised her that if she talked to the officers she could see her husband and therefore her waiver was not voluntary.

At the suppression hearing Button denied making any promises to Darla. He did say Darla asked to see her husband and he was unsure how he responded to her request. He testified he assumed he told her the matter was a decision for the Morris County sheriff's department. Based on this response, Darla maintains the promise was made, thus rendering her waiver and inculpatory statements involuntary.

On our de novo review we believe Button's testimony that he did not encourage Darla regarding visiting her husband. We do not suggest that a contrary finding would render the waiver or the confession involuntary. *See State v. Reid*, 394 N.W.2d 399, 404 (Iowa 1986) (deception merely one factor to be considered under totality of circumstances); *State v. Jacoby*, 260 N.W.2d 828, 832–33 (Iowa 1977) (rejecting claim that confession was coerced by implying accused could see her husband in hospital if she cooperated with investigation).

The record falls far short of demonstrating the level of deceit that would render Darla's waiver or statements involuntary.

▮ VI. Busch and Button interviewed Darla twice on June 27, first from 9:00 a.m. to 9:30 a.m. and the second time for thirty to forty-five minutes beginning at noon. These interviews produced highly inculpatory admissions. Although Darla was advised of her rights and waived them during the evening of June 25, and again on the afternoon of June 26, Button and Busch did not readminister the *Miranda* warnings on June 27. Darla was however reminded on the morning of June 27 that she had received the *Miranda* warning and acknowledged she understood. Contrary to Darla's contention, we do not believe the testimony of the two June 27 interviews should have been suppressed for lack of a new *Miranda* warning. *See State v. Russell*, 261 N.W.2d 490, 494 (Iowa 1978) (new warning not required where accused acknowledged he understood his rights after being reminded of *Miranda* warning previously given); *State v. Cooper*, 217 N.W.2d 589, 597–98 (Iowa 1974) (same). Darla attempts but fails to distinguish *Russell* and *Cooper*. Her challenge is without merit.

▮ VII. Notes Darla and her husband wrote to each other were left in the stolen car. They were recovered when the car was seized and contained highly inculpatory mat-

ters. They were admitted over Darla's claim they were protected under the marital privilege under Iowa Code section 622.9.

The marital privilege is indeed very broad, prohibiting disclosure of any protected communications between married persons. *State v. Klindt,* 389 N.W.2d 670, 675 (Iowa 1986). Only two exceptions to the marital privilege are recognized. One is for crimes against one spouse by the other. *Id.* at 676. The other exception is for child abuse. Iowa Code § 232.74; *State v. Johnson,* 318 N.W.2d 417, 438–39 (Iowa 1982). Neither of these exceptions is involved here.

Darla's argument however overlooks the fact that the law will not protect the confidence of marital communications where the married persons themselves do not. Thus there is no prohibition of testimony regarding communications between married persons by third parties who overhear them. *State v. Pepples,* 250 N.W.2d 390, 394 (Iowa 1977); *Shepherd v. Pacific Mut. Life Ins. Co.,* 230 Iowa 1304, 1310, 300 N.W. 556, 559 (1941); *Sexton v. Sexton,* 129 Iowa 487, 490–92, 105 N.W. 314, 315–17 (1905). Although these cases dealt with oral communications, we think the same rule applies to written marital communications.

Thus Darla, who left the notes in a car she and her husband had stolen, cannot insist the State protect against their disclosure because of a violation of marital confidence. The district court correctly rejected the contention.

VIII. Darla has objections pertaining to two jury instructions, one because it was submitted over her objection, the other because the instruction was not submitted despite her request. Neither complaint has to do with the instruction's form, only its appropriateness under the evidence. Our review is for abuse of discretion. *State v. Webb,* 516 N.W.2d 824, 831 (Iowa 1994). Any error in jury instructions must be prejudicial to warrant reversal. *Id.*

Darla first contends the district court abused its discretion by instructing the jury on the theory of joint criminal conduct as specified in Iowa Code section 703.2. Joint criminal conduct is a theory that is distinct from aiding and abetting:

> The aiding and abetting provision in section 703.1 thus relates to crimes which the defendant himself participated in to some degree, and which were jointly planned. A companion provision in section 703.2 of the Code relates to additional or other crimes committed by defendant's accomplices without defendant's personal participation, and without joint planning of the crimes.

*State v. Irvin,* 334 N.W.2d 312, 314 (Iowa App.1983) (quoting Kermit Dunahoo, *The New Iowa Criminal Code,* 29 Drake L.Rev. 237, 287 (1979–80)). The essential elements for imposing criminal liability on the basis of joint criminal conduct are:

1. Defendant must be acting in concert with another.

2. Defendant must knowingly be participating in a public offense.

3. A "different crime" must be committed by another participant in furtherance of defendant's offense.

4. The commission of the different crime must be reasonably foreseen.

*State v. Hohle,* 510 N.W.2d 847, 848 (Iowa 1994). Darla contends the record lacks a factual basis upon which to submit a joint criminal conduct instruction to the jury. In particular she claims the State failed to establish the above-quoted third and fourth necessary elements.

The record contains ample evidence from which a jury could reasonably infer that Darla acted in concert with her husband to commit one crime—namely robbery—and she could have reasonably foreseen that Ray would commit a different crime in furtherance of the initial offense. *Compare Hohle,* 510 N.W.2d at 848–49 (finding evidence in record of multiple assaults supporting joint criminal conduct instruction), *with Irvin,* 334 N.W.2d at 314–15 (finding no support in the record for the commission of any crime other than the burglary charge). There was evidence of Darla's preoccupation with the sisters' checks and savings bonds in her possession. There was also testimony of Darla's need for money. Evidence from her niece Stephanie detailed Darla's attempt to learn

whether Stephanie's stepfather would pay money if something happened to Stephanie. The jury could have readily believed that Darla agreed to rob the Miletiches, and, under the joint criminal conduct theory, should also be held responsible for Ray's act of murdering them.

Even though the State presented evidence from which the jury could have found that Darla was a principal or aider and abettor in all of the felonies charged, the State was entitled to a joint criminal conduct instruction on that theory in case the jury did not believe she aided and abetted the murders.

Darla also claims the joint criminal conduct instruction improperly rendered her culpable for Ray's acts of murder without requiring a finding she knew of his specific intent to commit those crimes. She is wrong in asserting she could have been convicted under such a theory without such a finding. Under the joint criminal conduct instruction, the jury was correctly required to find Darla acted with Ray to knowingly commit a crime, either as a principal or as an aider and abettor. From the joint conduct in committing the first crime it follows that she can be found vicariously responsible for other foreseeable crimes of a confederate. Darla seems to assert she should not be convicted without proving she had a *mens rea* to commit murder. We rejected this contention in *Conner v. State*, 362 N.W.2d 449, 455 (Iowa 1985) (fact that killing was not actually contemplated in undertaking robbery was no defense so long as *mens rea* to rob existed and murder was a consequence).

Darla's first instruction challenge fails.

In her second challenge to the jury instructions, Darla claims the district court erred in refusing to submit her proposed instructions defining an accessory after the fact under Iowa Code section 703.3. Her goal in these proposed instructions was to inform the jury that spouses are exempt from this provision.

The requested instructions were inappropriate on this record and were properly refused. Darla is in effect seeking a cure for which there is no disease; the State did not charge her with being an accessory after the

fact. Thus any defenses to such a charge were outside the issues in the case. *See* *State v. Johnson*, 534 N.W.2d 118, 124 (Iowa App.1995) (because accused was not charged as an accessory after the fact, instruction inappropriate).

The assignment is without merit.

IX. We find no merit in Darla's challenged testimony by her niece concerning a telephone conversation a week before the murders. Darla assails the testimony both on the claim she was not properly notified of the testimony, and because, she asserts, it was unduly prejudicial under Iowa rule of evidence 404(b). These rulings were discretionary. *State v. Hubka*, 480 N.W.2d 867, 868 (Iowa 1992). We find no abuse.

Although we have considered and rejected them, we have not detailed each of the specific arguments Darla raised in her brief. She received a fair trial in which there was no reversible error.

**AFFIRMED.**