# IN THE COURT OF APPEALS OF IOWA

No. 17-0130
Filed March 21, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**EDDIE HICKS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

A defendant appeals his conviction for murder in the first degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., and Vaitheswaran, Doyle, Tabor, and McDonald, JJ.

**TABOR, Judge.**

Eddie Hicks appeals his conviction for first-degree murder in the death of his girlfriend Kahdyesha Lemon.  Hicks challenges (1) the denial of his motion to suppress statements he made to police officers at the hospital; (2) the sufficiency and the weight of the State's evidence rebutting his intoxication and justification defenses; and (3) the denial of his request for substitute counsel.  Hicks also raises several pro se claims.

On the suppression issue, we do not find admission of his statements requires reversal of his conviction.  The record supports the district court's determination regarding the sufficiency and weight of the evidence.  And we find no abuse of discretion in the court's denial of substitute counsel.  None of the claims raised in Hicks's pro se supplemental brief entitle him to a new trial, though we preserve his ineffective assistance of counsel claim for postconviction proceedings.

I.      **Facts and Prior Proceedings**

Hicks and Lemon began dating in 2006 in Chicago.  They had a tumultuous relationship marked by infidelity and abuse.  They separated after an argument in May 2015.  Around Memorial Day that year Hicks called Lemon's mother threatening to "flatten [Lemon's] head into a pancake" and saying "[Lemon] is going to be one daughter [she] don't have anymore."  Hicks also said he recently discovered Lemon had misrepresented how old she was and because she was underage when their relationship began, Hicks expressed concern he "could be doing time as a result."  Around the same time, Hicks called Lemon's sister with

this dark message: "[Y]ou all going to catch you all sister in the casket; tell your mama to get this casket ready."

Hicks and Lemon reconciled on June 12, 2015. They took a bus from Chicago to Dubuque four days later. When they arrived in Dubuque, according to Hicks, "everything was fine." But Hicks later began to feel faint and sought medical attention. The next day started off as uneventful. Lemon went to work; later they picked up Hicks's medication, ate, smoked marijuana, and napped.

Hicks later said that upon waking up, he accessed Facebook on his phone, prompting an argument with Lemon. According to Hicks, he got up and went into the bathroom and Lemon threw a phone at him. Then the fight turned physical and Hicks recalled Lemon trying to hit him with a frying pan and stab him with a paring knife. Hicks said he returned Lemon's attacks.

Eventually, he fled the apartment and demanded water and alcohol from neighbors. A witness hanging out with friends at another apartment said she heard "somebody was yelling for help" and found Hicks with "blood all over him." She went to get water, but when she came back, Hicks was demanding alcohol, or "otherwise he's going to kill [them.]" Another witness gave Hicks a half-full bottle of Paramount rum and he "chugged it all."

Police responded to two 911 calls reporting a stabbing. One of the callers reported Hicks falling from a ten-foot retaining wall outside the apartment building. In an alley near Lemon's apartment, officers found Hicks sitting on the ground, bleeding from "a couple stab wounds." As the squad car pulled up, the first responding officer planned to render medical aid, but then she saw Hicks "scooting" toward her. Hicks started to grab the officer's leg and try to force his

4

way into her squad car, so she pinned him against the door and sprayed him with mace. The second officer to arrive observed that Hicks's conduct veered from erratic to calm. Hicks was able to answer the officer when asked for his first and last names, where he was staying, and what happened. Hicks said he'd been "stabbed up." Hicks also identified Kahdyesha as the person who stabbed him.

Emergency medical personnel loaded Hicks onto a cot and into an ambulance. He was handcuffed to the cot and a police officer rode along in the ambulance to the hospital. An emergency room doctor described Hicks as "intermittently agitated" and recalled at times "his language was difficult to understand" and other times he "spoke very clearly." Hicks had benzodiazepines, alcohol, and phencyclidine (PCP) in his system, according to a toxicology report.

Before he was sedated by medical staff so they could treat his injuries, Hicks spoke briefly with Officer Cory Tuegel in the emergency room. Tuegel asked Hicks just seven questions, starting with "what happened?" Hicks responded: "I loved her too much." Hicks clarified he was talking about his girlfriend, Kahdyesha Lemon. Hicks said Lemon was "home sleeping" but also acknowledged she suffered stab wounds. Hicks soon ended the conversation.

Back at the apartment building, officers discovered Lemon outside, suffering from more than one-hundred incised stab wounds. Inside the apartment, the floors were so soaked in blood that it was difficult for officers to keep their footing. Blood splatter glazed the walls of the bedroom, kitchen, and bathroom. An officer testified he could not remember an area of the home not covered in blood. Officers found a bent frying pan matted with hair and blood. Officers also

located a paring knife on the bed and later discovered two of Lemon's teeth, with the "whole root" attached, under the rug.

Medics rushed Lemon to the hospital and straight into a trauma room. Lemon was given roughly three times her blood volume to improve her blood pressure. Doctors shocked her heart and gave her epinephrine fifteen to twenty times to restart her heart. Despite these efforts, Lemon died three to four hours later of hemorrhagic shock. She was twenty-one years old.

Hicks woke up the next day in the hospital and asked about Lemon. Officers Brendan Welsh and Nick Schlosser set up an audio-recorder in Hicks's hospital room and interviewed him. According to Hicks, Lemon was angry because she just found out from Facebook that Hicks had been cheating on her "on and off for ten years." Hicks told them Lemon hit him with a pan and was trying to stab him. Hicks told the officers: "I hit her once probably, twice, all I was trying to do was get this girl up off of me." He later admitted hitting her as many as four times in the head. Hicks also said Lemon tried to stab him in the heart. He showed the officers he had four or five cuts to his chest and neck. But Hicks said he was able to take the knife from her. He admitted cutting her multiple times "anywhere" on her body. He also said he "knew he was stronger than her, that [he] could get away from her." Hicks told the officers he last smoked PCP four days before the stabbing. When Hicks was discharged from the hospital, he left in police custody.

The State charged Hicks with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2015). He pleaded not guilty claiming self-defense and intoxication. Hicks filed a motion to suppress his statements to Officers Tuegel, Welsh, and Schlosser. After concluding Hicks was not in custody

when questioned at the hospital, the district court denied Hicks's motion to suppress. Hicks also filed pro se motions requesting a change of venue and a new presiding judge. Hicks also filed a pro se motion seeking substitute counsel and claiming his legal team treated him poorly and lied to him. The court set Hicks's motion for hearing. At the hearing Hicks expressed his dissatisfaction with his attorneys and the court. The court denied his motion for substitute counsel.

Hicks waived his right to a jury trial and requested a change of presiding judge. The court noted his waiver of a jury trial, denied his request for a change of judge, and proceeded with a bench trial. Several responding officers and emergency medical personnel testified, as did Officers Tuegel, Welsh, and Schlosser. Lemon's mother and sister also testified about Hick's threatening phone calls. Both parties also presented expert testimony regarding the intoxicating effects of PCP. Hicks testified in his own defense. After a six-day trial, the court rejected Hicks's self-defense and intoxication defenses and found him guilty of first-degree murder. Hicks now appeals.

## II. Scope and Standards of Review

We review Hicks's suppression and ineffective-assistance-of-counsel claims de novo. *See State v. Young*, 863 N.W.2d 249, 252 (Iowa 2015); *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). For those constitutional claims, we independently evaluate the totality of the circumstances. *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001). We examine challenges to the sufficiency of the evidence for legal error. *See State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We review Hicks's challenges to the denial of a new trial, the denial of substitute counsel, and the judge's recusal decision for an abuse of discretion. *See State v.*

*Lopez*, 633 N.W.2d 774, 778 (Iowa 2004); *State v. Millsap*, 704 N.W.2d 426, 432 (Iowa 2005).  A court abuses its discretion if it acts unreasonably or bases its conclusions on untenable grounds.  *Millsap*, 704 N.W.2d at 432.

### III.    Analysis

### A.  Did the District Court Properly Deny the Motion to Suppress?

Before trial, Hicks moved to suppress all statements he made when interviewed by police at the hospital, alleging they were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section l0 of the Iowa Constitution.  The district court denied the suppression motion.

To be admissible, Hick's inculpatory statements to police must pass a "dual test."  *See State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997).  We first decide if police were required to give *Miranda* warnings, and, if so, whether police properly gave them.  *Id.*; *see Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (holding before police subject a person to a custodial interrogation, they must inform him of the right to counsel, that counsel may be appointed if he cannot afford it, his right to remain silent, and that any of his statements may be used as evidence against him).  Second, we resolve whether the statement is voluntary and satisfies due process.  *Countryman*, 527 N.W.2d at 557.  *Miranda* warnings are not required unless police subject the suspect to both custody and interrogation.  *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

### 1.      Statements to Officer Tuegel

Hicks contends the district court should have suppressed his statements to Officer Tuegel made shortly after arriving at the hospital.  He asserts Tuegel's

bedside questioning amounted to a custodial interrogation, and Tuegel did not provide Hicks with his constitutionally guaranteed *Miranda* warning. The State counters the defense claim by arguing Hicks was not in custody at the time so no *Miranda* advisory was required.

A *Miranda* warning must be given if a suspect is in custody resulting from formal arrest "or *any other circumstances* where the suspect is deprived of his or her freedom of action in *any* significant way." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009) (quoting *Miranda*, 384 U.S. at 444). When determining if a suspect is in custody, we consider the extent to which the suspect is restrained and if a reasonable person under such restraint would believe he was not free to leave. *See id.* We apply the following four factors: "(1) the language use to summon the individual; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the defendant is confronted with evidence of [his] guilt; and (4) whether the defendant is free to leave the place of questioning." *Id.* (quoting *State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003)).

Here, police did not summon Hicks to the hospital, but when they encountered Hicks outside Lemon's apartment, they used pepper spray and physically restrained him to prevent him from leaving the scene. An officer handcuffed Hicks to a cot and accompanied him in the ambulance. This officer remained at the hospital to ensure "Hicks was secure, for the investigation to continue" and described himself as "on guard duty," only leaving when another officer relieved him. Assuming without deciding a reasonable person subject to these restraints and this level of sustained supervision would not have felt at liberty to leave, we nevertheless conclude reversal is not required.

Assuming Hicks was in custody, because Tuegel did not issue a *Miranda* warning before questioning Hicks, the statements were inadmissible. *See Ortiz*, 766 N.W.2d at 251.[1] But we need not reverse if the error was harmless. *See State v. Peterson*, 663 N.W.2d 417, 430 (Iowa 2003). To establish harmless error, the State must prove beyond a reasonable doubt that the mistake did not contribute to the verdict. *Id.* at 431. We will look to the actual basis for the verdict and consider "the probative force of that evidence against the force of the erroneously admitted evidence standing alone." *Id.*

Because Hicks chose to try his case to the court rather than a jury, we have greater insight into the factfinder's reasoning. The verdict came with a description of what evidence the court considered when reaching its conclusion. The court did not mention Hicks's statements to Officer Tuegel, indicating they played no significant role in the finding of guilt. Hicks's prior threats to kill Lemon, his worry about prosecution for their sexual relationship while she was underage, and Lemon's extensive wounds were far more probative points than any incriminating inferences that the court could have drawn from Hicks's brief conversation with Tuegel. We conclude admission of the statements was harmless.

**2.**     **Statements to Officers Welsh and Schlosser**

---

[1] Hicks also argues his statements were involuntary under the totality of circumstances. To find a statement is involuntary, generally there must be coercive police activity. *State v. Vincik*, 398 N.W.2d 788, 790 (Iowa 1987). Hicks does not point to any indicator of coercive police activity, rather he makes conclusory statements claiming coercion. We do not find Hicks's capacity for self-determination was critically impaired or his will was overborne by Tuegel's brief questioning. *See State v. Tyler*, 867 N.W.2d 136, 176 (Iowa 2015) (finding statements voluntary though defendant had recently undergone surgery and told officers she was "really out of it"); *Countryman*, 572 N.W.2d at 558 (finding a defendant's statements were voluntarily given despite the fact she was "under the influence of drugs and was confused").

Next Hicks argues the district court should have suppressed the more extensive statements he made to Officers Welsh and Schlosser because he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights.[2] Hicks also claims these statements were involuntary due to his intoxication and physical and emotional condition at the time of questioning. The voluntariness assessment is identical for *Miranda* and due process purposes. *See Tyler*, 867 N.W.2d at 174.

### a. Waiver of *Miranda* Rights

When a defendant challenges the validity of a *Miranda* waiver, the State must establish by a preponderance of the evidence that the waiver was knowing, voluntary, and intelligent. *See Countryman*, 572 N.W.2d at 559. A waiver is voluntary if it is not the product of misconduct or overreaching by police. *Id.* And to be knowing and intelligent, the waiver must be made with an understanding of the rights given up and the resulting consequences. *Id.*

We look to a number of factors in deciding if Hicks voluntarily waived his *Miranda* rights, including his age, prior experience in the criminal justice system, whether he was under the influence of drugs, his mental ability, whether police used deception, his ability to understand the questions and respond, the length of the interrogation, his physical and emotional reaction, and whether any deprivation or physical punishment was used. *See Tyler*, 867 N.W.2d at 175.

Hicks was in his mid-twenties and had prior experience in the criminal justice system, telling the officers he was on parole at the time of the interview. He

---

[2] The State claims the interrogation by Officers Welsh and Schlosser was not custodial. As in the preceding section, we assume without deciding that their questioning also amounted to a custodial interrogation.

does not allege a limited intellectual ability. He appeared to understand the questions asked and responded appropriately. The officers did not use deception or any coercive tactics. The only factors highlighted by Hicks are his treatment in the hospital and his toxicology screen showing the presence of alcohol and controlled substances.

Considering all of the voluntariness factors, we find the *Miranda* waiver was valid. Officers Welsh and Schlosser came into Hicks's hospital room the morning after he was admitted and set up an audio-recorder. After Hicks awoke, the officers briefly chatted with him. They read Hicks his *Miranda* rights around 12:30 in the afternoon, stopping to confirm he understood each one. Hicks initially declined to speak with officers but said he would be willing to talk with them later. When the officers returned, they repeated the *Miranda* warnings and confirmed Hicks understood each right; this time he agreed to tell the officers what happened.

The officers did not employ intimidating, coercive, or deceptive means to induce Hicks to waive his *Miranda* rights. On the contrary, the recording verifies the officers used calm voices when approaching Hicks and confirmed his desire to talk with them. The officers even helped Hicks get the bottled water he preferred to the hospital's filtered water and offered their cellular phones to Hicks when he said he wanted to call his father but couldn't reach him on the hospital's phone. The State proved Hicks voluntarily waived his *Miranda* rights.

The recording also reveals Hicks waived his *Miranda* rights knowingly and intelligently. Both times the officer provided the *Miranda* warnings, Hicks confirmed he understood each right and the implications of waiver. Hicks argues he could not make a knowing and intelligent decision due to the residual effects of

sedatives and illicit drugs in his system. But a treating physician kept Hicks sedated until the illicit drugs left his system. And Hicks's conversations captured by the recording indicate he was aware of his situation and could communicate effectively with others. For example, he was able to recite his parents' phone numbers to hospital staff, express concern about physical discomfort resulting from a catheter, and discuss the medical purpose of a blood draw he initially did not want. Given Hicks's ability to interact coherently and his affirmative indications he understood the *Miranda* warning and still wished to talk with officers, we conclude the State proved Hicks's decision-making abilities were not impaired by the effects of sedatives or illicit drugs and his waiver was knowingly and intelligently made. *Id.* at 176 (finding Tyler voluntarily waived her *Miranda* rights at the hospital though she had lost a large amount of blood and was taking several medications).

### b. Voluntariness of Statements

Hicks claims even if his *Miranda* waiver was effective, the district court erred in determining his statements were voluntary. Involuntariness must generally be tied to police coercion. *Vincik*, 398 N.W.2d at 790 (Iowa 1987). But Hicks does not claim his statements were the product of coercion; instead he argues his drug intoxication and physical and emotional condition at the time of questioning prevented him from making voluntary statements. A statement may be involuntary if a person's "capacity for self-determination [is] critically impaired." *Countryman*, 572 N.W.2d at 558.

As noted above, Hicks's conversations captured by the recording do not reveal an impairment from either the lingering effects of medically administered sedatives or from his own use of illicit drugs. Hicks does not sound distraught or

irrational on the recording. He comprehends the officers' questions and gives coherent answers. Because Hicks's statements to Officers Welsh and Schlosser were voluntary, the district court properly allowed them into evidence.

But even if the district court should have suppressed Hicks's statements to Welsh and Schlosser—because Hicks either could not voluntarily waive his *Miranda* rights or could not make a voluntary statement due to the residual effects of sedatives—the error was harmless. *See Peterson*, 663 N.W.2d at 430 (noting reversal is not necessary when guilty verdict is "surely not attributable to the error"). During the interrogation, Hicks admitted defending himself against Lemon's attacks which is the same defense he advanced at trial and the same claim he made to friends on a jailhouse phone call. Any material admissions made during the interrogation were repeated at another time. Reversal would not be required.

**B.      Did the State Offer Substantial Evidence and Did the Court Correctly Deny Hicks's Motion for New Trial Based on the Weight of the Evidence?**

Hicks challenges both the sufficiency and the weight of the evidence for his first-degree murder conviction. As to sufficiency, we assess the record in the light most favorable to the State, including all reasonable inferences that we may fairly draw from the evidence. *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016). We will uphold the court's verdict if it is supported by substantial evidence. *Id*. Evidence is substantial when a reasonable fact-finder could rely on it to find the defendant guilty beyond a reasonable doubt. *Id*. Evidence is not substantial if it raises only suspicion, speculation, or conjecture. *Id*.

When reviewing the weight of the evidence, we must grant a new trial if the verdict is contrary to law or evidence. Iowa R. Crim. P. 2.24(2)(b)(6). A verdict is

contrary to evidence when it is against the greater weight of the evidence presented at trial. *State v. Taylor*, 689 N.W.2d 116, 133–34 (Iowa 2004). Under the weight-of-the-evidence standard, the court balances the evidence and considers the credibility of witnesses. *Id.* at 134. In deciding whether to grant a new trial on this ground, the district court enjoys wide discretion, but it must exercise that discretion carefully and sparingly. *Id.* We will discuss each claim in turn.

### 1. Intoxication Defense

Hicks contends the district court erred by concluding he could form the specific intent necessary to commit first-degree murder. "Specific intent not only requires the defendant to be aware of doing an act, but doing it with a specific purpose in mind." *State v. Guerrero Cordero*, 861 N.W.2d 253, 259 (Iowa 2015) (overruled on other grounds) (quoting *State v. Rinehart*, 283 N.W.2d 319, 320–21 (Iowa 1979)). According to Hicks's appellate argument, he was too high on PCP to form specific intent to kill Lemon. To prevail, Hicks must show he was so intoxicated he "could no longer reason and was incapable of forming a felonious intent." *See id.* "[I]f intoxication negates the specific-intent element . . . , [Hicks] can only be found guilty of a lesser included offense consisting of the act without the intent." *Id.*

Viewing the evidence in the light most favorable to the district court's ruling, we find ample evidence that Hicks could and did form specific intent to kill Lemon. While motive is not an element of murder, we have found it relevant to establish the mental elements necessary to prove first-degree murder. *See State v. Caples*, 857 N.W.2d 641, 646 (Iowa Ct. App. 2014) (holding motive evidence probative of

question whether defendant acted with malice aforethought). In this case, the fact finder could have reasonably concluded that Hicks—having forewarned Lemon's mother he would "flatten" her daughter's head "like a pancake"—acted precisely on that threat by smashing his girlfriend's face with a frying pan so hard that he knocked out her two front teeth at the root.

Moreover, Hicks's own testimony supports the district court's finding of specific intent. Hicks was able to provide a detailed account of his actions the day before the attack and the day of the attack, up until the time that Lemon allegedly became angry with him over a Facebook post. Hicks testified he could not remember the events well from that point forward. Although Hicks admitted smoking marijuana, he did not testify to using PCP either the day of the attack or the day before. In his interview with officers at the hospital, Hicks said he last smoked PCP four days before the stabbing. And although Hicks claimed at trial he had no memory of the attack, he was able to describe defending himself on a jailhouse phone call a few days later.

Physical evidence also supports the State's theory that Hicks was aware of what occurred. In another jailhouse phone call, Hicks recounted the attack and stated Lemon tried to mace him. Investigators found the remnants of a mace container in the apartment, corroborating Hicks's recollection. He testified Lemon began the attack by throwing a phone at him in the bathroom. Investigating officers found the phone between the toilet and bathroom wall indicating Hicks accurately remembered the evening's events.

Both Hicks and the State presented expert testimony regarding the impact of PCP on a person's reasoning abilities and thought processes. On behalf of the

State, criminalist Justin Grodnitzky testified a person will "feel the high effects thirty minutes to an hour. This high will last anywhere between four to six hours, and then you can have residual effects lasting twenty-four to seventy-two hours." But Grodnitzky cautioned PCP impacts each user differently and therefore the user's self-reported response to PCP is significant. Grodnitzky also found no correlation between the concentration of PCP in a person's blood and his level of cognitive impairment. Grodnitzky opined those impaired by PCP could still make conscious choices. He referenced studies involving PCP-impaired drivers who were still able to make conscious decisions to operate the vehicle. But the criminalist did caution that marijuana exacerbates the effects of PCP.

Forensic toxicologist Michael Rehberg testified on Hicks's behalf. He described PCP as "a dissociative anesthetic" meaning people intoxicated by PCP may be awake but unable to recognize their surroundings. According to Rehberg, PCP can trigger psychotic episodes and can cause an intoxicated person to "become paranoid, become fearful and respond in a negative way to those fears." To determine if a person is under the influence of PCP, Rehberg suggested attempting to interact with the person to see if he can understand the conversation. Additionally, Rehberg found a correlation between person's blood concentration of PCP and his level of intoxication. But Rehberg also described PCP as "still just truly totally unpredictable." He believed there is no way to know with certainty how a person will react to PCP each time he uses it regardless of his blood concentration levels. Rehberg also disagreed with Grodnitzky about the effects of mixing PCP and marijuana, opining marijuana and benzodiazepines can dampen the effects of PCP if used together.

On appeal, the defense focuses on Rehberg's testimony, asserting the level of PCP in Hicks's blood (twenty nanograms per milliliter the next day) and his erratic conduct after the attack lead to the inevitable conclusion that Hicks was so intoxicated that he could not form specific intent. We disagree the expert evidence or Hicks's behavior inexorably points to the success of Hicks's intoxication defense. Both Rehberg and Grodnitzky agreed PCP's effects are unpredictable—differing from person to person. And Rehberg conceded marijuana and benzodiazepines can mitigate PCP's impact, and both were in Hicks's system at the time of the attack. Although the experts disagreed whether the degree of intoxication correlates to the level of PCP in a person's system, the court was entitled as the fact finder to evaluate the two experts and choose to believe the State's expert on that point. *See State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984).

The district court could have reasonably rejected the intoxication defense based on Hicks's ability to communicate with others after the attack. Rehberg testified a person's inability to communicate with others or failure to realize others are even present may show PCP intoxication. But Hicks was able to make demands of witnesses after he fled Lemon's apartment and responded coherently to their questions.[3] That information, coupled with Grodnitzky's view that a person can be impaired by PCP but still understand his actions, suggests Hicks was capable of forming specific intent.

The district court also could have reasonably accepted Grodnitzky's view that a person's self-perception of PCP intoxication is important. Hicks told his

---

[3] Hicks can be heard talking to a neighbor in the background of a recorded 911 call.

father from jail that he was not intoxicated and "there was nothing wrong" with him at the time of the attack. Hicks also complained to friends that his "lawyer is trying to use the PCP/self-defense but I know it was straight self-defense on my part." Given Hicks's ability to remember the attack during his interview with officers, his statements indicating he did not feel intoxicated, his failure to identify his most recent PCP use at trial, his ability to communicate with neighbors immediately after the attack, and the experts' agreement that PCP impacts each user differently, the record contains sufficient evidence that Hicks could form specific intent.

As to the weight of the evidence, we find no abuse of discretion in the district court's denial of a new trial. *See Taylor*, 689 N.W.2d at 134 (discussing limited appellate review). The district court had the opportunity to evaluate the expert testimony indicating PCP impacts each user differently and Hicks's own concessions that "there was nothing wrong" with him during the attack. *See Heaton v. State*, 420 N.W.2d 429, 432 (Iowa 1988) (noting a defendant's recollection of events to others negated his "blackout claim" made at trial). The district court also could consider Hicks's earlier threats against Lemon in deciding whether the intoxication defense was viable. The greater weight of the evidence concerning specific intent to kill did not tip the scales against the district court's finding of guilt.

### 2. Self-Defense

Hicks also alleges the district court erred in failing to determine his actions were justified. "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any imminent use of unlawful force." Iowa Code § 704.3. The State bears the

burden to prove justification did not exist. *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). To rebut Hicks's claim of self defense, the State was required to prove one of the following: (1) Hicks started or continued the incident which resulted in Lemon's death; (2) Hicks had an alternative course of action was available; (3) Hicks did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him; (4) Hicks did not have reasonable grounds for the belief; or (5) the force used by Hicks was unreasonable. *See State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006).

Hicks contends the State did not present substantial evidence to rebut his self-defense claim. He cites his own testimony alleging Lemon was the aggressor. Hicks told officers at the hospital Lemon initiated the attack by swinging a pan at him. A neighbor testified he heard both Hicks and Lemon yelling "I'm going to kill you" the night of the attack.[4] Based on this evidence, Hicks argues he had no other course of action available and had to use force to get away from Lemon because the apartment only had one exit, and he reasonably believed he was in imminent danger based on Lemon's wielding of the frying pan and paring knife.

But even assuming Lemon initiated the attack and Hicks reasonably needed to use *some* force to avoid harm, the State provided substantial evidence that the amount of force used by Hicks was unreasonable. Only one knife was recovered from the scene, covered in blood from both Lemon and Hicks. From this evidence, the fact finder reasonably could conclude Hicks disarmed Lemon and then launched his own knife attack, stabbing her 113 times. Lemon also suffered blunt-

---

[4] At his deposition the neighbor stated he only heard Lemon make the threat.

force trauma and two of her teeth were knocked out. The medical examiner classified Lemon's wounds as defensive. Given the extreme nature of Lemon's injuries, the record contains sufficient evidence supporting the State's position that the brutality used by Hicks far exceeded what was necessary to protect himself, defeating Hicks's self-defense claim.

Hicks's weight-of-the-evidence argument also fails on his justification defense. While Lemon's injuries alone weigh in favor of unreasonable force, they provide even more persuasive proof when compared to Hicks's superficial cuts, the longest measuring three centimeters. The greater weight of the evidence supported the court's rejection of Hicks's self-defense claim.

## C. Did the District Court Properly Deny Hicks's Motion for New Counsel?

Hicks argues he was entitled to substitute counsel after alleging a breakdown in attorney-client communications. To justify appointment of substitute counsel, Hicks must show "sufficient cause" for changing attorneys. *See State v. Martin*, 608 N.W.2d 445, 449 (Iowa 2000). A conflict of interest, irreconcilable conflict, or a complete breakdown in communication between the client and attorney may serve as sufficient cause. *Id.* To show a complete breakdown in communication, Hicks must show a severe and pervasive conflict with counsel or contact so minimal that meaningful communication was not possible. *See State v. Tejeda*, 677 N.W.2d 744, 752 (Iowa 2004).

Once Hicks raised a "colorable complaint" about his counsel, the district court had a duty to investigate. *See id.* at 750. The court makes an adequate inquiry by asking the defendant the nature of the communication problem. *Id.* at 751. A defendant who simply expresses "frustration with the proceedings" has not

demonstrated a complete breakdown in communications. *Lopez*, 633 N.W.2d at 781. Here, the district court held a hearing on the motion for substitute counsel and asked Hicks open-ended questions about his dissatisfaction. Hicks noted his complaints were contained in his motion and a letter he mailed to the court. In those filings, Hicks alleged his attorneys had "lied, deceived, duped and [were] not even doing [at least] their best ability to prove [his] innocence, for the charges brought against me." He complained that "since day one" his counsel had talked down to him, "hollered" at him, and hung up during the phone calls. He alleged the defense attorneys' secretary had lied to him about their availability. Hicks also believed his attorneys were "basically forcing [him] to go to trial" even though he was not ready. He generally "refuse[d] to work with a public defender in Iowa" alleging their caseloads were too high and they lacked the experience "to fight high profile cases."

When the court gave Hicks an opportunity to expand on his concerns and provide supporting evidence, Hicks offered an unfocused critique of the overall handling of his case. A review of the hearing reveals Hicks's dissatisfaction with the legal system as a whole and not his counsel specifically. Hicks made some references to pro se filings claiming his attorneys failed to file the correct motions, but the record shows counsel filed the same motions when appropriate. The court gave Hicks the chance to personally explain his conflict as required by *Tejada* and *Lopez*. *See* 677 N.W.2d at 750 (recognizing duty to inquire when a defendant alleges a breakdown in communication); 633 N.W.2d at 781 (noting court gave the defendant an opportunity to explain a communication problem).

While best practices might encourage a district court to probe more deeply into the reasons behind a defendant's request for substitute counsel, we conclude the court here made adequate inquiry into Hicks's claims and Hicks failed to prove a complete breakdown in communication. *See State v. Marshall*, No. 03-0990, 2006 WL 1279042, at *4 (Iowa Ct. App. May 10, 2006).[5]

We also note any communication difficulties between Hicks and his attorneys appear to have been resolved before trial. At a hearing eleven days later, Hicks noted that after the hearing on his motion for substitute counsel, he agreed to sit down and talk his attorneys and was now "happy" with them. It is possible for pretrial communication breakdowns to be resolved before trial. *See Tejeda*, 677 N.W.2d at 752. And when pretrial breakdowns are timely remedied, the defense suffers no adverse effect. *See id.* Because Hicks conceded any communication breakdown was remedied less than two weeks later, we conclude his defense was not adversely affected and the court did not abuse its discretion in denying Hicks's motion.

**D. Hicks's Pro Se Claims**

In addition to arguments briefed by counsel, Hicks presents several claims on his own accord.[6] First, he alleges the State committed prosecutorial misconduct

---

[5] In *Marshall*, the defendant wrote the court and complained his attorney was not representing him correctly, failed to return phone calls, was not available when the defendant wanted to communicate with him, and claimed his attorney was not experienced enough and lacked the skill necessary to mount an effective defense. *Id.* When asked twice at a hearing why he didn't want to be represented by current counsel, Marshall failed to elaborate on the claims made in his letter. *Id.* This court concluded the district court made adequate inquiries and Marshall failed to prove a complete breakdown. *Id.*

[6] Some of Hicks's pro se issues reiterate claims addressed by counsel and require no additional analysis.

by way of a *Brady* violation.[7]  To prevail Hicks must show by a preponderance of the evidence "(1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material to the issue of guilt."  *See DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011) (citation omitted).  Hicks requested the State provide him a table frame, the broken tabletop, a sample of tabletop glass from Lemon's wounds, and a portion of blood soaked carpet.  The court ordered the materials be provided to Hicks.  Nothing in the record indicates the State failed to comply with the order; Hicks cannot show the prosecution suppressed the evidence.  *See id.*

Next Hicks challenges the cause of Lemon's death, noting she suffered a punctured lung during an operation to treat her wounds.  But Hicks can only be relieved of liability "if an intervening act breaks the chain of causal connection between [his] actions and [Lemon]'s death."  *State v. Garcia*, 616 N.W.2d 594, 597 (Iowa 2000).  "[T]he intervening act must be the *sole* proximate cause of death." *Id.*  An act is not a superseding cause if it is a normal consequence of the situation created by a defendant.  *Id.*  Had Hicks not stabbed Lemon more than one hundred times and beat her with a frying pan, she would not have required emergency medical attention.  The punctured lung resulted from surgery, a normal consequence of the stabbing, and was not the sole cause of her death.  Lemon died of blood loss.  Hicks cannot escape liability.

Hicks also contends the district court judge should have recused himself. Hicks believes because he filed motions and affidavits complaining about the

---

[7] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding due process requires the prosecution to disclose exculpatory evidence to the accused).

judge's performance, the judge could not be impartial. But "[o]nly personal bias or prejudice stemming from an extrajudicial source constitutes a disqualifying factor." *Millsap*, 704 N.W.2d at 432. "[A]ctual prejudice must be shown before a recusal is necessary." *Id.* Because Hicks does not show the judge had any knowledge other than what he learned in court as the proceedings progressed, the judge had no cause to recuse.

Finally, Hicks alleges he received ineffective assistance of counsel. He asserts his counsel lied to him. Because the record is not developed adequately to reach this issue, we preserve the claim for postconviction relief proceedings. *See State v. Coil*, 263 N.W.2d 293, 296 (Iowa 1978).

**AFFIRMED.**

Vaitheswaran, Doyle, and McDonald, JJ., concur; Danilson, C.J., concurs specially.

**DANILSON, Chief Judge.** (concurring specially)

I concur in all respects with the majority opinion but write separately to acknowledge the weighty issues of whether Hicks had the ability to form the specific intent of premeditated murder and, if so, whether he formed the intent before the act resulting in death.

The evidence reflects that Hicks did not start the conflict with Lemon, and Hicks was under the influence of alcohol and drugs at the time of the murder. Very soon after the murder, Hicks was out of control and incoherent due to intoxicants. In a somewhat similar factual scenario, but limited only to intoxication by alcohol, the Iowa Supreme Court stated:

> The jury should have been directed that, while it is not necessary that premeditation, deliberation, and intent to kill should have existed for any particular length of time before the killing, yet the intent to kill should have preceded the act of killing long enough to admit premeditation and deliberation; and as to whether there was such time, the jury are the judges. But, regarding the instruction as correct, and assuming that the jury were not misguided by its somewhat obscure and uncertain language, and really found that deliberation and premeditation did precede the act resulting in death, in accord with the language we have just used in our opinion, the evidence utterly fails to authorize the conclusion that deliberation and premeditation on the part of defendant did precede the fatal stabs causing death. They were given in a conflict while defendant was excited by intoxicating liquors, if not intoxicated. There is no evidence tending to show that after the conflict began there could have been, before the stabbing, a moment—an instant of time—for deliberation and premeditation. Certainly, there is not one word of evidence tending to prove that, before the conflict commenced, there was premeditation and deliberation. We therefore conclude that the finding of the jury to the effect that there was deliberation and premeditation, upon which the verdict of murder in the first degree is based, is utterly unsupported by the evidence, and should have been set aside upon this ground by the district court. For the error in failing to do so the judgment is reversed.

*State v. Sopher*, 30 N.W. 917, 920 (Iowa 1886).

Unlike the facts in *Sopher*, here Hicks made a statement to Lemon's mother that he would kill Lemon. Although Hicks and Lemon may have briefly reconciled after the statement, the statement is evidence of Hicks' state of mind. Moreover, sometime during the conflict, a neighbor heard a woman and a man say they were going to kill the other. Consequently, even if Hicks had abandoned his earlier state of mind as expressed to Lemon's mother, Hicks may well have had sufficient time for premeditation and deliberation during the conflict. Yet, it is possible that Lemon had already suffered sufficient knife wounds when the statement was made by Hicks and that Lemon's death was imminent. Nonetheless, the sheer number of knife wounds inflicted by Hicks upon Lemon is also evidence of premeditation and deliberation. *See Winston v. State*, 269 S.W.3d 809, 812 (Ark. 2007) (holding "the nature, extent, and number of wounds inflicted"—forty-five stab wounds most of which were easily treatable and survivable—permit an inference of premeditation and deliberation).

With respect to Hicks' intoxication defense, without the testimony of the neighbor hearing Hicks' statement during the conflict and the neighbors who first encountered Hicks after the conflict, the evidence may well have negated the specific-intent element because soon after the murder Hicks was incoherent. However, the neighbors' testimony was sufficient for the district court to reject the intoxication defense.

Accordingly, I find these facts distinguishable from the facts in *Sopher* and support the majority's finding of sufficient evidence to affirm the conviction.