# IN THE COURT OF APPEALS OF IOWA

No. 20-1511
Filed September 1, 2021

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DAWN LORYNE CHAMBERS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Mahaska County, Rose Anne Mefford, District Associate Judge.

Dawn Chambers appeals the denial of her motions to suppress, as supplemented. **AFFIRMED.**

S. P. DeVolder of The DeVolder Law Firm, PLLC, Norwalk, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Dawn Chambers, convicted of operating while intoxicated (OWI), third offense), appeals the denial of her motions to suppress evidence, specifically: incriminating statements she made to law enforcement[1] and DataMaster breath test results obtained via search warrant. She posits (1) her statements at the scene should have been excluded because they stemmed from custodial interrogation without the benefit of *Miranda*[2] warnings; (2) her statements post-arrest and the breath-test result should have been excluded because she was not informed of her right to make a phone call under Iowa Code section 804.20 (2019); and (3) the breath test results should have been excluded because she was not told she could obtain an independent chemical test under Iowa Code section 321J.11. Lastly, in response to her supplemented motion to suppress, Chambers challenges the search warrant, alleging it was void because of a mistake in the return warrant. *See* Iowa Code § 808.8.

**I. Facts and Earlier Proceedings.**

On a late afternoon in August 2019, a passing motorist, along with his son, driving in rural Mahaska County saw a damaged car lodged in a ditch with a female lying on the ground behind it. The travelers stopped to offer aid to the female, later identified as Chambers, before reporting the accident to the Mahaska County Sheriff's Department. Deputy David Wilke was the first to respond to the scene. He observed Chambers's car "nose down" in the ditch with a damaged front

---

[1] Chambers moved for suppression of two sets of statements; those she made at the scene of the accident (captured by police body cameras) and statements she made at the jail house (captured by surveillance cameras in the building).
[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

bumper and the rear hanging in the air perched on the edge of the ditch. After confirming Chambers was okay, he began asking her questions to figure out what happened. At first Chambers said, "I made a bad decision" but did not explain how her car ended up in the ditch and repeatedly denied there was an accident. Deputy Wilkes implored Chambers to tell him what happened. But she said, "I am not going to answer anything because I don't know what I'm supposed to say." Deputy Wilkes suspected Chambers was impaired; he smelled alcohol, observed she was unsteady on her feet, and thought "she did not appear to be her normal self" based on his past experience with her. He asked Chambers if she had anything to drink, but she did not respond.

At this point Deputy Matthew McCain arrived. Deputy McCain first spoke with the passing motorist, who told him he believed Chambers was intoxicated. Next, Deputy McCain investigated Chambers's car. While reaching through the open front passenger door to turn down the radio, he saw a small empty bottle of Fireball whiskey on the floor. Deputy McCain approached Chambers, still standing with Deputy Wilkes, and asked her how many drinks she had consumed. She replied "two." Deputy Wilkes continued to ask Chambers what happened, and she admitted purchasing two "shooters" of Fireball whiskey earlier. Deputy Wilkes then walked away to speak with Chambers's boyfriend, who volunteered to get the car out of the ditch.

While Deputy Wilkes spoke to Chambers's boyfriend, Deputy McCain interviewed her on the side of the road. He told her he noticed the empty Fireball bottle and asked if that is what she had been drinking and whether there was any "drug usage." Chambers replied, "No, you can test me. I mean I'll pee in a cup."

Deputy McCain next asked Chambers if she smoked marijuana; she said she did "once in a while." When asked the last time she smoked marijuana, Chambers said, "It's been a minute." When pressed for a more specific time frame, she said it was "probably a month about, I'm not a bad person. I go to work every day." Deputy McCain replied, "Right, but just give me an idea when the last time was." Chambers admitted it had been "a few days." As the conversation continued, Chambers expressed fear that the deputies were "mad at her" and thought she was "a bad person" and a "drug addict." Chambers began to cry, and Deputy McCain assured her he did not think she was a bad person. Chambers next asked Deputy McCain whether her boyfriend could take her home, and he replied, "We don't know yet." Moments later, Chambers's father arrived. During a tearful exchange, she apologized repeatedly and asked her father, "Why are you here, how'd you know?" to which he replied, "Dawn, you called me."

Deputy Wilkes returned to the side of the road where Chambers stood with Deputy McCain and her father. He asked her what route she took and whether she hit a mailbox earlier.[3] Chambers said she did not think she hit a mailbox but may have. At this point Deputy Wilkes returned to his squad car to fill out an accident report and had no further interaction with Chambers.

Deputy Brent DeRonde arrived at the scene last. Still on the side of the road, Chambers spoke with Deputy DeRonde. The deputy said, "I understand you've had something to drink today," to which Chambers replied, "Yup." He asked Chambers how much she had to drink. She replied, "A couple of shots." Next,

---

[3] It was reported that a mailbox on a nearby road had been hit roughly thirty minutes earlier.

Deputy DeRonde asked if she would perform field sobriety tests (FST). Deputy McCain asked Chambers whether she thought she was drunk, and she replied, "I could potentially have some alcohol in my system." Shortly after, Chambers agreed to perform the FST, but because she recently broke her ankle, Deputy DeRonde decided to skip walking tests and administered the horizontal gaze nystagmus test. (HGN) Chambers struggled to follow the test instructions and ultimately displayed six out of six of clues indicating impairment.

Minutes after Chambers completed the HGN test, Officer DeRonde asked if she would take a preliminary breath test (PBT). She agreed. He then asked Chambers how long it had been since her last drink; she said it had been an hour. Shortly before blowing into the machine Chambers became upset and exclaimed, "I'm going to fail, I made a bad decision." In tears, Chambers repeatedly said, "I'm going to spend the rest of my life in jail," and, "You aren't going to let me out [of jail] because you think I'm a bad person." Both deputies tried to calm her down. Deputy McCain administered the PBT and then told her the results, commenting, "That's pretty high, Dawn." Officer DeRonde remarked that her pupils looked small during the HGN test and asked if she had taken any prescription drugs. She replied, "You think I might be high on something. You can test me. I'm not. Give me some more. I'm not on anything else." Deputy DeRonde said he believed her, then handcuffed Chambers and led her to his squad car.

Deputy DeRonde transported Chambers to the Mahaska County Jail. Rather than invoking implied consent, he applied for and received a search warrant to collect a "blood, urine, and/or breath specimen" from Chambers. Chambers joined Deputy DeRonde in the "intoxilzyer" room of the jail, and he told her he had

a search warrant to take another breath sample. Chambers responded by holding out her arm and stating, "You can have my blood," but Deputy DeRonde repeated he was taking a breath sample. He then read from portions of the search warrant. Chambers asked Deputy DeRonde, "[W]hat happens if I refuse [to take the test]?" and he read from a portion of the warrant stating she could be held in contempt of court for refusing. Chambers, distressed and emotional, again expressed concern that Deputy DeRonde thought she was a bad person.

Deputy DeRonde then administered the breathalyzer test. As they waited for the results, Chambers asked if her dad or boyfriend could come pick her up. DeRonde explained that it was up to the jailers to decide whether she would be released. Chambers also said, "It's horrible, it's horrible," referring to the test results before they were complete. After the results were processed, Deputy DeRonde told Chambers her blood alcohol content was .216. In tears, she said she was going to prison and would lose her job. She then said, "I'll give you my blood. You can test me for any other drugs." Officer DeRonde said nothing, and he left the room moments later.

Chambers was charged with OWI, third offense. She moved to suppress her incriminating statements and the breath test result. The district court denied the motions in all respects. Chambers stipulated to a bench trial. And after considering the minutes of testimony, the body camera footage, and all other evidence submitted during the suppression hearing, the district court found her guilty. She appeals.

**II. Standard of Review.**

We review Chambers's *Miranda* claim, related to her incriminating pre-arrest statements, de novo. *See State v. Miranda*, 672 N.W.2d 753, 758 (Iowa 2003).

Because the basis for Chambers's claims are all statutory, we review for correction of legal error. *See State v. Casper*, 951 N.W.2d 435, 437 (Iowa 2020) (reviewing district court's denial of motion to suppress breath test result for correction of legal error where court's ruling was based on interpretation of section 321J.11); *State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) (reviewing for correction of legal error where district court denied motion to suppress based on its interpretation of section 804.20). Under this standard, "[i]f the district court applied the law correctly and substantial evidence supports the court's findings of fact, we will affirm the district court's ruling on a motion to suppress." *Davis*, 922 N.W.2d at 330. As far as Chambers challenges the execution and return of the search warrant under Iowa Code section 808.8, we again review for correction of errors at law.

**III. Analysis.**

**1. Were Chambers's Incriminating Statements at the Scene of the Accident Obtained in Violation of *Miranda*?**

Chambers argues the incriminating statements she made to law enforcement at the scene of the accident were the product of custodial interrogation without the benefit of *Miranda* warnings and should have been suppressed.

"*Miranda* warnings protect a suspect's Fifth Amendment right against self-incrimination 'ensuring that a suspect knows that he may choose not to talk with law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" *State v. Ortiz*, 766 N.W.2d 244, 249 (Iowa 2009) (citation omitted). There must be both custody and interrogation, otherwise *Miranda* warnings are not required. *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997).

Here there is no question Chambers was not read her *Miranda* rights at the scene of the accident. That said, the State argues *Miranda* warnings were not required because Chambers was not in custody before being handcuffed. Rather, the State maintains she was only detained during a brief investigation.

Iowa courts have recognized scenarios where police detention does not equate to custody. For example, "[t]he temporary detention of a motorist in an ordinary traffic stop is not considered 'in custody' for purposes of *Miranda*." *State v. Scott*, 518 N.W.2d 347, 350 (Iowa 1994) (citation omitted). While a traffic stop, like the accident investigation here, "significantly curtails the 'freedom of action' of the driver" the Supreme Court has held persons "temporarily detained" during an "ordinary traffic stop . . . are not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 436, 440 (1984). "This remains true, we have held, even if the driver 'is asked to perform field sobriety tests.'" *State v. Decanini-Hernandez*, No. 19-2120, 2021 WL 610103, at *5 (Iowa Ct. App. Feb. 17, 2021) (citation omitted). Similarly, a police officer with a reasonable suspicion of criminal activity or traffic violations may briefly detain a driver to investigate. *State v. Struve*, 956 N.W.2d 90, 95–96 (Iowa 2021).

"For purposes of the Fifth Amendment, a suspect is in custody as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." *State v. Tyler*, 867 N.W.2d 136, 171 (Iowa 2015) (altered for readability) (citations omitted). "In determining whether a suspect is 'in custody' at a particular time, we examine the extent of the restraints placed on the suspect during the interrogation in light of whether a 'reasonable man in the suspect's position would have understood his situation' to be one of custody." *Ortiz*, 766 N.W.2d at 251 (citing *Berkemer*, 468 U.S. at 442). Our test is objective, and we assess four factors: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of guilt; and (4) whether the defendant is free to leave the place of questioning." *Id.* at 251–52 (citing *Miranda*, 672 N.W.2d at 759).

First, Chambers was found at the scene after a passing motorist reported the accident. No one summoned Chambers.

Second, the purpose of the deputies' questions were investigatory; they asked questions pertaining to how the accident occurred and whether Chambers was intoxicated. "The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning." *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). Such was the case here. The deputies reasonably suspected Chambers was intoxicated and asked reasonable investigatory questions. The place of the questioning was on a public road, and at times there were more civilians than law-enforcement present. The manner of questioning was professional. Deputy McCain and Deputy DeRonde spoke softly, told Chambers they did not think she was a "bad person," and reassured her she

would not "spend the rest of her life in jail" as she became increasingly distraught and emotional. They were patient with Chambers, even as she veered off topic. Further, the deputies never commanded Chambers to do anything. She answered questions and agreed to the HGN test and PBT, and they did not threaten her with arrest to get information or obtain her consent.

Turning to the third factor, the deputies did not hide the fact that they suspected Chambers was intoxicated, but their investigatory questions were not confrontational. Deputy McCain mentioned the empty bottle of Fireball found in Chambers's car and asked if that is what she had been drinking. At various times all three deputies asked if she had been drinking. At most, they asked basic questions one would expect a police officer to ask when investigating a car accident potentially involving alcohol.

Chambers puts the most stock into the last factor, arguing she was in custody because she was not free to leave the scene. True, before the HGN test or PBT, Chambers asked Deputy McCain if her boyfriend could take her home and he replied, "We don't know yet"—because the investigation was not complete. And at trial, the deputies confirmed they would not have allowed Chambers to leave if she had tried. But when police have reasonable suspicion of criminal activity or traffic violations, they may temporarily detain a driver without placing them in custody. *Struve*, 956 N.W.2d at 95–96.

We also "weigh the degree of physical restraint imposed during the interrogation." *Countryman*, 572 N.W.2d at 558. Chambers was not restrained until she was handcuffed after performing the PBT. None of the deputies exerted any physical control of her person. Although the deputies were armed, no

weapons were drawn, and the environment was relaxed. When her father arrived, she hugged him and engaged in a tearful conversation. At one point she even tried to hug Officer McCain. Though she was not free to leave the area entirely, her freedom of movement was not otherwise restrained.

To summarize, the deputies responded to the scene of a single car accident on a public road, and the caller who discovered Chambers told them he thought she was intoxicated. All three deputies spoke to Chambers and had ample reason to believe she was intoxicated based on objective signs of impairment. They asked Chambers questions; how the accident happened, and whether she had been drinking or taken any drugs. The questioning was "direct, non-confrontational, investigative in nature, and not coercive or threatening." *See State v. Davis*, No. 08-1942, 2009 WL 4116322, at *5 (Iowa Ct. App. Nov. 25, 2009). And Chambers was not physically restrained.

Based on the totality of the circumstances, we find Chambers was detained but was not in custody for purposes of *Miranda* until she was handcuffed by Deputy DeRonde. Thus, *Miranda* warnings were not required before that point. We affirm the denial of Chambers's motion to suppress evidence of the incriminating statements she made at the scene of the accident.

**2. Was Chambers Denied Her Right to an Independent Chemical Test under Iowa Code Section 321.J11?**

Chambers posits the breath test results should have been suppressed because she was not informed of her right to obtain an independent chemical test under Iowa Code section 321J.11. The State argues Deputy DeRonde did not

have to inform Chambers because she never invoked her right to independent chemical testing related to alcohol usage.

Iowa Code section 321J.11 states, "The person may have an independent chemical test or tests administered at the person's own expense in addition to any administered at the direction of a peace officer." Chambers is correct that section 321J.11(2) provides arrestees a statutory right to an independent chemical test at their own expense. *See State v. Lukins*, 846 N.W.2d 902, 906 (Iowa 2014). Importantly, the *Lukins* court held section 321J.11(2) itself does not require officers to advise arrestees of the statutory right *unless* the arrestee requests an independent chemical test. *Id.* at 909. When examining whether an arrestee invoked the right, we construe their statements liberally:

> [a]ny statement that can be reasonably construed as a request for an independent chemical test is adequate to invoke the detainee's right to such a test . . . . [A]n officer who fields a legally imprecise request . . . cannot stand mute and deny the request. Rather, if an imprecise statement, reasonably construed, implicates the statute, then the officer should inform the detainee of his or her right to an independent chemical test . . . .

*Id.* (citations omitted). In a later decision, our supreme court held evidence of breath test results must be suppressed where the statutory right to an independent chemical test is properly invoked and the officer fails to advise the arrestee of the right. *State v. Smith*, 926 N.W.2d 760, 762 (Iowa 2019).

We must decide whether Chambers invoked her right to an independent chemical test. We focus on two statements she made to Deputy DeRonde in the "intoxilyzer room" of the jail. After Deputy DeRonde told Chambers he had a warrant to collect a breath sample, she held out her arm and said, "You can have my blood." This statement could be construed as a request for a blood test in lieu

of the breath test the deputy asked of Chambers. "Statements regarding chemical testing in lieu of the officer's testing are insufficient to invoke section 321J.11." *Smith*, 926 N.W.2d at 762 (focusing on the substance of the statements made to decide if a defendant inquires about a right to take an independent test).

However *after* Chambers blew into the breathalyzer, she again stated, "I'll give you my blood. You can test for any drugs." Deputy DeRonde did not respond, and he walked out of the room moments later. The district court found this was not a request for additional testing, "but [was] consistent with her earlier offer at the scene" to provide a urine sample in an attempt to "convince the deputies she was not a drug user and not a bad person." But as *Casper* teaches:

> It is arguably misleading and unfair to say no to a detainee who asks for a certain type of retest without telling the detainee that he or she can have a different type of retest. But it is not misleading or unfair to give the detainee exactly the type of retest the detainee asks for.

951 N.W.2d at 439 (finding that a request for a retest on the breath test carries no implication for an advisory about independent testing). Here, we find it disingenuous to argue Chambers did not ask for a blood test—whatever her reasoning may have been.[4] And we note her earlier request for a blood test did not reference drug usage. It is not unexpected that Chambers's chosen words to invoke her right to a different test were not legally accurate. *See Lukins*, 846 N.W.2d at 908. It imposes no harsh burden on law enforcement to advise the

---

[4] Deputy McCain testified at the suppression hearing:

Q. And certainly from August 25th on, it has been the case where, if an OWI suspect says to the effect when she's in front of the DataMaster, "I'll give you my blood," or, "You can take my blood," you're—the officer is required to inform the suspect and to assist that suspect unless it's impossible or close to it to have an alternative blood sample taken; correct? A. I believe it is.

detainee of a right to an independent test after a request is made. Certainly, to ensure compliance with section 321J.11, on close calls, making the advisory is the better practice from a practical standpoint.[5]

Likewise, to address her impairment—albeit resulting from drug use—Chambers offered to "pee in a cup" and give her blood for testing purposes. While Chambers's statements reveal she was interested in giving a blood sample to prove she had no drugs in her system, she had a right to the independent tests she requested to address her impairment. *See Ginsberg v. Iowa Dep't of Transp.*, 508 N.W.2d 663, 664 (Iowa 1993) (holding that when a detainee requests an independent chemical test, officers should convey to the detainee information about the detainee's statutory right to the independent test). In our inquiry, "the guiding principle is one of fairness, not disclosure." *Casper*, 951 N.W.2d at 439.

We find the State violated the requirements of section 321J.11 and suppress the breath test results on this basis.

But our inquiry does not end here. A violation of section 321J.11 is a nonconstitutional error. *See State v. Garrity*, 765 N.W.2d 592, 598 (Iowa 2009) (analyzing violation of section 804.20). "Where a nonconstitutional error [i]s claimed, the test for determining whether the evidence [i]s prejudicial and therefore require[s] reversal [i]s this: 'Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?'" *Id.* at 597 (alterations in original) (citation

---

[5] Even an imprecise statement, reasonably construed, implicates the statute such that the officer should inform the detainee of her right to an independent chemical test at her own expense under Iowa Code section 321J.11. *Lukins*, 846 N.W.2d at 909.

omitted). We presume prejudice unless the record affirmatively establishes otherwise. *Id.* Compelling evidence of Chambers's intoxication came from the officers' statements and the various video clips of Chambers at the accident scene. After a trial on a stipulated record that included the minutes of testimony, body cam footage, and testimony of the deputies, the trial court found Chambers guilty of OWI. The trial court noted:

> With respect to element 2, the court finds that the State has proven this element beyond a reasonable doubt. The defendant appeared intoxicated to Deputies Wilke and DeRonde. The defendant admitted consuming alcohol. The defendant's eyes were blood shot and watery, she was unsteady on her feet and her breath smelled of an alcoholic beverage.

Thus, even without the breath test results, strong evidence supported the trial court finding that Chambers operated her vehicle under the influence. *See State v. Truesdall*, 679 N.W.2d 611, 616 (Iowa 2004) (defining "under the influence" as when consumption of alcohol "affects the person's reasoning or mental ability, impairs a person's judgment, visibly excites a person's emotions, or causes a person to lose control of bodily actions"). Any violation of Chambers's rights under 321J.11 was harmless error. *See id.* at 598. While Chambers's motion to suppress should have been successful on this basis, it does not require a new trial.

**3. Was Chambers Denied a Phone Call in Violation of Iowa Code Section 804.20?**

Chambers asserts a violation of Iowa Code section 804.20. She argues Deputy DeRonde did not allow her to make a phone call, requiring suppression of any statements she made after her arrest, as well as the breath test result. The

State argues there was no violation because Chambers never asked to make a phone call.

> Iowa Code section 804.20 provides:
>
> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both.

In determining whether Chambers invoked her right to call a family member, our analysis is much like the above analysis of Iowa Code section 321J.11. Like section 321J.11, section 804.20 "does not itself require that a peace officer advise the detainee of the detainee's rights under the statute." *Casper*, 951 N.W.2d at 438. Likewise, "any statement that may be reasonably construed as invoking the detainee's right to communicate with family or counsel is adequate." *Lukins*, 846 N.W.2d at 907. "[T]he detainee's and officer's statements and conduct, as well as surrounding circumstances, are considered objectively." *State v. Moorehead*, 699 N.W.2d 667, 672 (Iowa 2005).

The context of Chambers's request is crucial to our determination. While sitting in the intoxilyzer room with Deputy DeRonde, roughly five minutes before providing a breath sample, Chambers said, "They're not going to let me out of here, right?" Deputy DeRonde replied, "That's up to the jailers." Chambers then blew into the DataMaster machine. While waiting for the results she asked Deputy DeRonde, "Can my dad come get me or my boyfriend come get me tonight?" Deputy DeRonde responded, "That's up to the jailers, I really don't have any control over that." Chambers contends her request for her dad or boyfriend to retrieve her invoked her statutory right to communicate with a family member. We

disagree that, in the context of Chambers's statement, these words can be "reasonably construed as invoking [her] right to communicate with family or counsel." *Lukins*, 846 N.W.2d at 907. Yet, a panel of this court recently found that the question "My wife, she gonna come?" invoked the defendant's right to "call, consult and see" a member of his family.[6] *State v. Lopez Gonzalez*, No. 19-0081, 2020 WL 1054051, at *3 (Iowa Ct. App. Mar. 4, 2020) (finding that failure to advise defendant of the right to call, consult and see a family member required a new trial). Context is everything; but here, Chambers appeared to be requesting a ride home.

But, even if we find her statement did require an advisory of her right to make a phone call, the conviction stands if the error is harmless. *Garrity*, 765 N.W.2d at 597 ("We presume prejudice, but may find harmless error if the evidence related to the violation was cumulative to other admissible evidence."). Thus, in any event, there was no violation of Iowa Code section 804.20, and the district court did not err in declining to suppress the breath test results and statements she made post arrest.

**4. The Return Warrant.**

Lastly, Chambers argues the search warrant used to obtain her breath sample was void, based on a mistake in the return warrant inventory sheet. She cites Iowa Code section 808.8, which states in part:

> A search warrant *shall be executed within ten days from its date; failure to execute within that period shall void the warrant*. Property

---

[6] In *Lopez Gonzalez*, the defendant had a limited ability to communicate in English and could not read Spanish. 2020 WL 1054051, at *1. Plus, the record did not reflect the presence of an interpreter at the jail. *Id.*

seized and its containers, if any, shall be safely kept by the officer, and incident thereto:

. . . .

2. The officer must file, with the officer's return, a complete inventory of the property taken, including a sworn statement that is accurate to the best of the officer's knowledge.

(Emphasis added.) Deputy DeRonde returned the warrant with an inventory sheet which said, "The following is a complete inventory of the property seized pursuant to this warrant." There are three boxes to check underneath that line: blood specimen, urine specimen, breath specimen. Deputy DeRonde crossed out the urine and breath boxes, suggesting he took a blood specimen. Chambers argues this rendered the warrant void under the statute, reasoning, "[T]he warrant was not properly executed as no blood specimen was taken . . . within ten days, let alone even up to today's date."

We disagree. The search warrant authorized Deputy DeRonde to collect a "blood, urine, and/or breath specimen." Thus he did not exceed the scope of the warrant by collecting a breath sample, a less intrusive process than taking blood. Deputy DeRonde executed the warrant the same day he received it. Chambers does not cite, and we cannot find, any authority that says suppression of evidence obtained via search warrant is required based on a mistake in a return warrant. We affirm the denial of Chambers's motion to suppress on this basis.

**IV. Conclusion.**

We reverse the denial of Chambers's motions to suppress the breath test result but affirm the denial of the motion to suppress the incriminating statements

before the testing.  Finding harmless error for the failure to provide an independent test, we affirm the conviction for OWI.

**AFFIRMED.**