# IN THE COURT OF APPEALS OF IOWA

No. 20-0127
Filed October 6, 2021

**ROBERT EDWARD SINN,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Henry County, John M. Wright,

Judge.


        The defendant appeals from the denial of postconviction relief following his

conviction for sexual abuse in the third degree.  **AFFIRMED.**


        Thomas Hurd of the Law Office of Thomas Hurd, PLC, Des Moines, for

appellant.

        Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee State.


        Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Robert Sinn was convicted of sexual abuse in the third degree in November 2016. Postconviction relief was denied in 2020. He appeals from this denial, claiming that his trial counsel provided ineffective assistance by not suppressing evidence that he asserts should have been kept out because *Miranda* warnings were not given. He further argues he was prejudiced by the decision to not move for suppression. We review ineffective-assistance-of-counsel claims de novo. *State v. Harris*, 891 N.W.2d 182, 185 (Iowa 2017).

## I. Background Facts and Prior Proceedings.

This court previously found the facts of this case as follows:

> In August 2016, Sinn was temporarily staying with C.W., his former partner and mother of his seventeen-year-old daughter S.S. During his stay with C.W., Sinn repeatedly propositioned C.W. for fellatio and sexual intercourse. On one occasion, he exposed his penis to her and asked her to perform oral sex. She declined his repeated advances. On the night of August 4, C.W. testified she drove Sinn to the bar for drinks because Sinn was not licensed to drive. While out with Sinn, C.W. consumed four drinks. C.W. testified she had no recollection of any events after consuming her last drink until she awoke and found herself lying on her stomach in a ditch. She testified her head was inside a metal pipe, it was raining, she was cold, and she felt pain in her eye and vagina. She was naked from the waist down—wearing only a shirt but no underwear, shorts, or shoes. C.W. clawed her way up the muddy ditch, walked to a nearby home, and banged on the door. The homeowner answered the door. The homeowner testified C.W. was hysterical and covered in mud. He called the police. Then he took C.W. into the bathroom and placed her in the shower because she was so caked in mud she was having trouble seeing.
>
> C.W. was taken to the Henry County Health Center. She was treated and released, but she came back later in the day because she was having anxiety and suffering pain in her ribs. The examining physician testified C.W. had suffered trauma to her face and head. Her eye was bruised and almost swollen shut. C.W. had scratches and abrasions on her lower extremities. C.W. reported pain in her vaginal area. The physician noted an area of abrasion on the vaginal introitus that appeared to be recent. The physician completed a rape

3

kit. There was no semen detected. The doctor believed C.W. had been assaulted with possible penetration of the vagina. Bloodwork tested positive for the presence of alcohol and marijuana but no other substances.

S.S., Sinn and C.W.'s daughter, was living with Teresa Roberts, C.W.'s neighbor. S.S. testified when she got home from work, Sinn was at Roberts' house. He was nervous and soaking wet. He told S.S. four different versions of the events of the evening, but all of the versions ended with C.W. being left in the ditch because, according to Sinn, C.W. got out of the car and refused to get back in. Nonetheless, S.S. did not go search for C.W., concluding her mother would call if she needed help. S.S. testified Sinn later asked her "if Mom had a black eye," which caused S.S. to grow concerned. S.S. testified she saw Sinn with a little blue pill earlier in the day. He called the pill "his happy pill."

Roberts testified Sinn woke her up that evening around 11 p.m. He was wet and pacing. He told her he was with C.W. and C.W. had gotten out of the car to vomit. Sinn told Roberts C.W. would not get back in the car so he left C.W. in a ditch. He told Roberts C.W. did not have her phone because it was in his car. He also told Roberts he saw C.W. "being handsy" with a man at the bar earlier in the evening and appeared upset by this. Roberts gathered up a friend of her son and went to go look for C.W. They looked for approximately one hour, but they did not find her.

New London Assistant Chief of Police Brandon Fowler spoke with Sinn on the night in question. Officer Fowler initially went to C.W.'s residence to conduct a welfare check on C.W.'s ten-year-old son, who was at home alone. After speaking to C.W.'s son, Fowler went to Roberts' house to ask her some questions. Fowler learned Sinn was at Roberts' house, and he asked for Sinn to come outside and speak with him. Sinn did, and Fowler asked him where he had been and with whom. Fowler testified Sinn kept asking over and over again if C.W. was all right and repeating "he hoped he wasn't in any trouble for this." Sinn told Fowler C.W. had gotten drunk and performed oral sex on him while Sinn drove around. Sinn told Officer Fowler C.W. exited the car after the two fought and fell down "like three different times." Fowler testified Sinn told him he tried helping C.W. into the car but could not so he left her there to try and get help. At this time, Fowler had not yet told Sinn C.W. was found and at the health center.

Henry County Deputy Sheriff Jesse Bell also interviewed Sinn on the night in question. Deputy Bell had been at the health center with C.W., but he left when he learned Fowler had located Sinn at Roberts' house. Sinn initially told Deputy Bell C.W. left the bar with another man. Sinn told the deputy he got a ride home with a cousin. Deputy Bell told Sinn he believed C.W.'s phone was in Sinn's car, and Bell asked if they could retrieve it. Sinn consented. The deputy

observed a brown sandal on the passenger floorboard. Sinn located the matching sandal and C.W.'s phone in the backseat and gave them to Deputy Bell. The phone had mud stuck to it. The deputy walked around the vehicle and shined his flashlight through the window. He observed jean shorts on the driver's side in the backseat. Sinn consented to the deputy taking the shorts out of the vehicle. The shorts were wet and muddy. Sinn told Deputy Bell the shorts belonged to him and the shorts were wet and muddy because Sinn had fallen down while wearing them. The shorts were women's shorts, and the deputy concluded the car was part of the crime scene and secured the vehicle to be searched pursuant to a warrant. Upon searching the vehicle later, the authorities found a pair of women's underwear in the backseat. C.W.'s driver's license was in the pocket of the denim shorts. C.W. later identified the underwear, shorts, and sandals as the clothing she wore that night. Deputy Bell observed Sinn had white gravel and dirt caked onto his jeans.

After Deputy Bell told Sinn he did not believe his story, Sinn's version of events changed. Sinn stated he and C.W. left the bar together and drove around while C.W. performed oral sex on him. Sinn said the two tried to have sex but were too drunk. At some point, according to Sinn, C.W. exited the vehicle because they were arguing or because she needed to vomit. She refused to get back into the vehicle. Sinn told police he left C.W. there and went to get help. He said he did not call anyone for help because "he doesn't use his phone." He was adamant he and C.W. did not have sexual intercourse. Sinn also said he lied initially because he was afraid he would be in trouble for leaving C.W. on the side of the road.

*State v. Sinn*, No. 17-0549, 2018 WL 2084844, at *1–2 (Iowa Ct. App. May 2, 2018). During the course of the initial conversation with Sinn, Deputy Bell was also speaking with others that were at the house. Sinn was free to wander around the premises as he chose and did so, going to get a blanket and speaking with other individuals.

After a while, Deputy Bell left Roberts's home and continued his investigation. He asked Sinn if "he minded hanging out" with Officer Fowler a while longer, which Sinn agreed to do. Sinn was told he could sit or sleep or proceed as he chose. When Deputy Bell returned, Sinn was sleeping again. He asked Sinn to wake up and come speak with him in the yard. Then, he and Sinn talked through

the course of events from the evening one more time. At this point, Deputy Bell informed Sinn that he believed he was guilty and summarized what he had learned to arrive at that conclusion. Sinn denied his guilt. The conversation ended when Sinn was arrested.

Sinn was charged with sexual abuse in the second degree,[1] and a jury found him guilty of sexual abuse in the third degree as a lesser-included offense. Sinn was determined to be a habitual offender.

Sinn appealed the conviction, which was affirmed by a panel of this court in May of 2018. But undeterred, Sinn then turned to postconviction relief. He claimed that his counsel should have moved to suppress any evidence from his conversations with law enforcement and evidence found in his vehicle after a warrantless search. Noting other substantial evidence of his guilt, the district court determined that the decision not to suppress evidence did not prejudice Sinn's case.

## II. Analysis

Pointing to trial counsel and appellate counsel, Sinn speculates that all of his statements to law enforcement and the evidence obtained from the vehicle he was driving would have been suppressed if each had done their job. Ineffective-assistance-of-counsel claims require the applicant to prove both (1) counsel did not perform an essential duty, and (2) the failure caused prejudice. *Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). The claim will fail if the applicant is

---

[1] Sinn was also charged with theft, but this charge was dropped.

unable to prove either element by a preponderance of the evidence. *State v. Gant*, 597 N.W.2d 501, 504 (Iowa 1999).

Sinn argues that his counsel's failure to move for suppression based on *Miranda* breached an essential duty and the evidence's admission at trial created prejudice. The Fifth Amendment of the United States Constitution, extended to the states with the Fourteenth Amendment, guarantees a privilege against self-incrimination. *State v. Harris*, 741 N.W.2d 1, 5 (Iowa 2007). In *Miranda v. Arizona*, the Supreme Court stated that this privilege is threatened when someone is taken into custodial interrogation—thus, the ubiquitous *Miranda* rights became the talk of case law and crime shows alike. 384 U.S. 436, 444 (1966).

However, what is not developed on television is *when* an individual is entitled to their *Miranda* rights. For *Miranda* warnings to be necessary, the individual must be subject to both custody and interrogation. *State v. Schlitter*, 881 N.W.2d 380, 395 (Iowa 2016); *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997). Sinn frames the "fighting issue [as] whether [he] was subject to custody." Sinn and the State dispute if Sinn was in custody when officers spoke to him at C.W.'s home without advising him of his *Miranda* rights. If he was, the evidence should have been suppressed by a motion his counsel did not make. *See, e.g.*, *State v. Miranda*, 672 N.W.2d 753, 761 (Iowa 2003).

Sinn spoke to two separate officers, Officer Fowler and Deputy Bell, at C.W.'s home. While there were three separate conversations, Sinn asserts that the overall interaction violated *Miranda* because he was in custody. Custody is determined by an objective test, examining all of the circumstances of the interrogation to find if there is a formal arrest or a restraint on the freedom of

movement akin to a formal arrest. *Countryman*, 572 N.W.2d at 557–58. Specifically, courts evaluate four factors: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning." *Id.* at 558. We take each conversation in turn.

### A. Officer Fowler.

The four factors do not reflect that Sinn was in custody while he was speaking with Officer Fowler. Officer Fowler originally asked Roberts to wake Sinn up and request that he come outside. Sinn came out of his own accord. The purpose of the original conversation was to keep an eye on Sinn while Deputy Bell made his way to the home. Then, Sinn was asked if he would be willing to speak to another officer, and he agreed. The questioning did not occur at an official location, but in the lawn between Roberts's and C.W.'s residence where Sinn was temporarily staying.[2] The first conversation with Fowler, which lasted twenty-five minutes at most, was made up of only preliminary questions about where Sinn had been the night before and with whom. Fowler did not confront Sinn with any implication of his guilt—in fact, Fowler did not even tell Sinn that C.W. had been found or that she was in the hospital. Other than asking if Sinn could speak to another officer, Sinn was free to leave at any time even if Fowler did not explicitly tell him so.

---

[2] "[T]he general rule is that in-home interrogations are not custodial for purposes of *Miranda*." *State v. Evans*, 495 N.W.2d 760, 762 (Iowa 1993). However, if the "usual comforts of home [are] taken away," a suspect can be in custody in their own home. *Miranda*, 672 N.W.2d at 760.

Sinn argues that his liberty was so restrained that he felt the need to ask Officer Fowler if he could smoke a cigarette. He also attests that he felt like he was in trouble, and it is undisputed that he made statements to that effect. However, we evaluate custody through an objective standard, not based on Sinn's subjective experience. *Countryman*, 572 N.W.2d at 557.

During the first conversation with Officer Fowler, Sinn was not in custody.

## B. Deputy Bell's first conversation.

Sinn was not in custody during his first conversation with Deputy Bell. Sinn was already outside and had agreed to talk to Deputy Bell by the time he arrived. Deputy Bell intended to speak with Sinn as a person of interest; still, he was there to collect information and retrieve C.W.'s cell phone. The conversation continued as they moved between Roberts's porch and the car in C.W.'s yard, which was out in the open and near where Sinn was temporarily staying. Sinn had agreed to go to the car, and even agreed to let Deputy Bell look inside of it and retrieve C.W.'s cell phone. Yet, Deputy Bell told Sinn he thought he was not telling the truth when Sinn said he and C.W. had left the bar separately, implying that the deputy believed Sinn might be guilty or at least knew more than he was letting on. However, Deputy Bell did not push Sinn with any evidence to that effect. After Sinn and the deputy had already looked in the car, and Deputy Bell once again told Sinn he did not believe he was being entirely truthful, Bell told Sinn that other witnesses mentioned Sinn was upset with C.W. This is the first time Deputy Bell confronted Sinn with evidence he had gleaned from his investigation. Still, Sinn was free to leave—in fact, he began speaking with others on the premises. While Sinn did ask Deputy Bell's permission to do things like get a blanket from the house or sit on the porch,

at no time had Deputy Bell required that Sinn seek permission.  Likewise, Deputy Bell never prevented Sinn from doing anything Sinn asked to do.

Because at least three of the four factors point to the conversation not amounting to custodial interrogation, a request for suppression based on *Miranda* would have been unsuccessful for suppressing evidence found in Sinn's car or his statements.[3]

### C.  Deputy Bell's second conversation.

Deputy Bell left the area of C.W. and Roberts's yard at one point to gather other evidence and then twenty minutes later returned to find Sinn asleep.  This third conversation did not amount to an interrogation or custody.

Once Sinn was awoken, Deputy Bell suggested they speak in the yard rather than summon Sinn to an official location or force him to move.  The yard was still familiar ground for Sinn.  Sinn was not restrained, stopped from leaving, nor told he could not leave.  However, there was a shift in the conversation—Deputy Bell laid out the evidence against Sinn in no uncertain terms and painted a picture of how he believed the night transpired, fully confronting Sinn with Deputy Bell's belief that Sinn was guilty.  In the most generous reading, this is when custody might have begun.  But, no additional evidence was garnered from this portion of the conversation—the officers already had the clothing and shoes from the car and Sinn's statement of the facts.

---

[3] We are not convinced, even had a *Miranda* challenge been successful, that the evidence from the car would have been suppressed.  Regardless, because suppression was unwarranted, we do not address the issue here.

As three out of four factors point to this conversation not constituting custody, Sinn was not entitled to *Miranda* warnings.

All three conversations with law enforcement, then, were not held while Sinn was in custody—thus, *Miranda* warnings were not required. Counsel did not breach an essential duty by failing to raise a meritless motion. *State v. Rice*, 543 N.W.2d 884, 888 (Iowa 1996) ("Because any motion to exclude . . . would have been meritless, defense counsel had no duty to make such a motion.").

## IV. Conclusion.

Because Sinn did not carry his burden to show his counsel breached an essential duty, his claim of ineffective assistance fails and the trial court correctly dismissed his claim for PCR.

**AFFIRMED.**

Schumacher, J., concurs; Vaitheswaran, P.J., concurs specially.

**VAITHESWARAN, Presiding Judge** (concurring specially).

I specially concur. Assistant Police Chief Fowler testified that Deputy Bell told him Sinn "was a suspect of his." He also stated Bell told him "to stay with [Sinn] until he got there." Fowler's testimony supports a determination that Sinn was in custody. But even if counsel had a duty to file a suppression motion, I would find an absence of *Strickland* prejudice. *See State v. Madsen*, 813 N.W.2d 714, 727 (Iowa 2012). Accordingly, I too would affirm the denial of Sinn's postconviction-relief application.