**IN THE COURT OF APPEALS OF IOWA**

No. 24-0235
Filed January 23, 2025

**GARY LEE ALEXANDER,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Black Hawk County, Andrea J. Dryer,

Judge.


        An applicant for postconviction relief appeals the district court's denial of his

most recent application.  **AFFIRMED.**



        Jessica Donels of Parrish Kruidenier, L.L.P., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Nicholas E. Siefert, Assistant Attorney

General, for appellee State.



        Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**SANDY, Judge.**

Gary Lee Alexander appeals the dismissal of his most recent application for postconviction relief (PCR). He argues his trial counsel was ineffective for (1) failing to move to suppress his statements to authorities on the basis he had not been read his *Miranda* rights and (2) failing to object to trial testimony from law enforcement officials on the basis that their testimony was vouching for the victim. We affirm the district court's dismissal of Alexander's PCR application.

## I. Background Facts and Proceedings

Alexander ran an afterschool basketball program for young girls that he called "Gary's Girls." He misused that position of access and authority to sexually exploit and abuse a young girl hundreds of times for over half a decade, beginning in 1997 when she was in fifth grade.

The victim was tall for her age and enjoyed basketball but had quit playing due to her parents' inability to provide transportation for the sport. After Alexander met the victim, he convinced her parents to allow him to drive her home from practices so that she could participate in "Gary's Girls." He would keep the victim at the gym following practices for "individualized sessions," during which he would touch her inappropriately, including pulling her hips against his groin. Alexander also became trusted by the victim's family, praising her athletic ability and continuing to assist with transporting her to basketball events.

Alexander gradually continued to groom the victim, taking her to parks where eventually he would touch her inappropriately. He then began to drive her to places other than training locations, including the local mall. Then, after one practice, Alexander took the victim to a hotel and told her she needed to shower.

After she showered, Alexander compelled the victim to walk across the hotel room naked while he watched her in a state of undress. He forced himself on the victim, then eleven years old, and proceeded to rape her.

Following those acts, Alexander pressured the victim into keeping quiet, calling her a "good girl" and suggesting her family would be disappointed if she did not continue playing basketball. He conditioned the victim's future playing time on allowing him to continue raping her. These acts, including oral sex, occurred at local parks, hotels, and his residences. His behavior escalated into other forms of violence as well, including biting her genitals, handcuffing her, and binding her to a bed. In one incident "he hit [the victim] so hard the condom broke" so he took her to the emergency room for a morning-after pill and "pretended to be [her] father." On another occasion he chased her around his apartment with a knife when she attempted to end the relationship of abuse.

Following the victim's completion of fifth grade, Alexander entered her into beauty pageants and acted as her "manager" to further justify his increasing exposure to the victim. He would photograph her in different clothes and swimsuits under the guise of modeling. Alexander's grooming of the victim was so thoroughly effective that the victim gradually transitioned from viewing him as a father figure to believing she loved him romantically. She wrote him letters envisioning their future marriage.

Alexander was not always careful about hiding his predation. In addition to the emergency room incident, there were a couple of occasions, including a car accident, in which police had reason to ask why he was alone with the victim, but she never revealed what was happening. Eventually he pushed too far. When the

victim was a junior or senior in high school, he adamantly argued to her mother that she should put the victim on birth control. Taken aback, the victim's mother asked Alexander, "Are you having sex with my daughter?" She testified "it [was] the first time I've ever seen him be flustered for words, and you could almost see the color drain out of his face, just got kind of ashen gray." The mother prohibited the victim from further contact with Alexander.

The victim later told a boy she trusted and "really liked" what Alexander had been doing to her. The boy encouraged her to report the behavior. He informed a school counselor and the counselor asked the victim what had been going on between her and Alexander. The victim stated nothing had happened because she "didn't want something to happen to [the boy]." But Alexander found out and "started threatening [the boy]'s life." The victim tried to end her contact with Alexander, which led to the knife-chasing incident. She never directly contacted him after that.

In 2009 the victim reported the abuse to the director of residence life at her college. Although the director encouraged her to report the abuse to the police, she did not do so because she believed it would be difficult to prosecute Alexander after all that time. She did report the abuse to her parents. Three years after that she reported the abuse to an old family friend who took her to the police to make an official report. The victim explained she "had established [herself] . . . in Atlanta. And [she] felt like [she] ha[d] enough willpower to come forward."

The subsequent investigation corroborated the victim's account of events. Police found handcuffs and twine attached to Alexander's bed and other handcuffs and twine in storage in his residence. There were more than one thousand

photographs of the victim strewn throughout the apartment including on the walls and in Alexander's wallet. There was a picture of the victim in a bathing suit hung on the wall, and police found the exact bathing suit depicted in that image in storage in the apartment. Five letters the victim had written to Alexander were also recovered from the residence.

During that search, Alexander was at the Cedar Falls police department because the police requested that he come in to talk. The police informed Alexander they were investigating the victim's report, and he agreed to come in for the interview. Alexander gave numerous inconsistent accounts within that interview. After initially claiming he had never seen the victim naked, he shortly after admitted that he had sex with her when she was in eighth or ninth grade and eventually conceded to having had sex with her when she was in sixth grade. He also admitted to having the victim perform oral sex on him, using food during sex acts, and tying her to the bed.

Alexander's counsel advised him not to testify in his own defense at trial. Alexander was advised that testifying in his own defense would remove any possibility of having his police interview confession suppressed or excluded. But Alexander decided from the onset that he would testify in his own defense. Due to that insistence, his counsel stated that the entire trial strategy had been planned around allowing the confession to be submitted so that Alexander could address it. Alexander personally confirmed to the district court that this was how the trial strategy was formulated.

THE COURT: All right. Do you want to make any further record at this time?

> ALEXANDER'S COUNSEL: I'd simply ask that Mr. Alexander to confirm the record that that has been the extent of our discussions with respect to [his trial strategy]. Is that correct, Mr. Alexander?
>
> ALEXANDER: Yes, that's correct.

During his testimony, Alexander claimed he purposely made admissions to the interviewing officer as a tactical measure to expose "entrapment" and "lies" by the Cedar Falls police. He also claimed his cavalier attitude and laughter while describing the sexual abuse he engaged in was "acting" and that he was "laughing at [the interviewing officer]."

Alexander was convicted of one count of second-degree sexual abuse and two counts of third-degree sexual abuse, in violation of Iowa Code section 709.1 (2013). We affirmed his convictions on direct appeal. *See State v. Alexander* (*Alexander I*), No. 14-0173, 2015 WL1332344, at *1 (Iowa Ct. App. Mar. 25, 2015). Alexander filed his first PCR application in July 2015, which was denied on the merits. On appeal, it became apparent that his PCR counsel had not developed a sufficient record on which his PCR claims could be decided. *See Alexander v. State* (*Alexander II*), No. 17-0390, 2020 WL 820329, at *2–3 (Iowa Ct. App. Feb. 19, 2020). While the appeal of the first PCR was still pending, Alexander filed a second PCR application in July 2017, raising issues not fully litigated in the first PCR application. We then affirmed the district court on his first PCR appeal. *Id.* at *3. Alexander next filed a third PCR application in June 2020, alleging ineffective assistance of his first PCR application counsel. The second and third PCR applications were combined into a single PCR action, which is the action before us on appeal. The district court denied the combined PCR action on the merits.

Alexander now appeals.

## II. Standard of Review

We review claims for ineffective assistance of counsel de novo. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

## III. Discussion

Alexander argues his trial counsel was ineffective for (1) failing to move to suppress his statements to police on the basis he had not been read his *Miranda* rights and (2) failing to object to trial testimony from law enforcement officials on the basis that their testimony was vouching for the victim.

As an initial matter, we agree with Alexander that his claims in this matter are not barred by res judicata. The district court ruled in his favor on this issue, finding that Alexander's counsel in his first PCR action was ineffective in "fail[ing] to perform an essential duty because [PCR counsel] did not ensure that the underlying trial court record from [the criminal trial] became part of the record in the first post-conviction relief trial, which a reasonably competent attorney would have done." And in his first PCR appeal, we found the lack of record available for review would make it "improvident for us to assess trial counsel's effectiveness in the criminal proceedings." *Alexander II*, 2020 WL 820329, at *2. So we now review the issues presented in this PCR appeal in light of the fully developed record.

Alexander's claims concern the ineffectiveness of his first PCR counsel which, in turn, are reliant on the ineffectiveness of his trial counsel. On each claim, Alexander "must establish by a preponderance of the evidence that '(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.'" *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018) (quoting *State v. Harris*, 891 N.W.2d 182, 185 (Iowa 2017)); *accord Strickland v. Washington*, 466

U.S. 668, 687 (1984). Failure to prove either will preclude relief. *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017).

Alexander carries the burden to prove, by a preponderance of the evidence, that his counsel's alleged failure resulted in prejudice. *See Strickland*, 466 U.S. at 687; *Lopez*, 907 N.W.2d at 116. That requires a showing that a reasonable probability exists that the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.". *Irving v. State*, 533 N.W.2d 538, 540 (Iowa 1995) (citation omitted) .

### A. Suppression of Statements to Police

Alexander argues that he "received ineffective assistance of counsel, to his prejudice, when trial counsel failed to file a motion to suppress his un-warned interrogation." He argues that the circumstances surrounding his statements to authorities indicate he was subjected to a custodial interrogation, thus implicating *Miranda*. We disagree.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The United States Supreme Court explained in *Miranda v. Arizona* that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. 436, 478 (1966). If the *Miranda* warning is not given, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." *Id.* at 444.

"*Miranda* warnings are not required unless there is both custody and interrogation." *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997). There is no dispute that the officer interviewing Alexander was conducting an interrogation or that Alexander was not given a *Miranda* warning. Thus, we only need to determine whether Alexander was in custody during the interview.

To determine whether the individual being interrogated was in custody, we look to "the objective circumstances of the interrogation" rather than the "subjective views harbored either by the officer or the person being questioned." *Id.* We examine all the circumstances surrounding the interrogation but ultimately make our decision based on "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (cleaned up). We ask whether a reasonable person in Alexander's position would understand themselves to be in custody. *See State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). The four factors we consider in this determination are: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning." *Countryman*, 572 N.W.2d at 558 (cleaned up). Based on these factors, we determine that Alexander was not in custody during the interrogation at the Cedar Falls police station.

Beginning with the first factor, Alexander was never placed in handcuffs. When the special agent and detective contacted him at his apartment, they informed him of the reason for their visit and requested he speak with them at the

police station. They assured him that he would not be arrested nor held against his will. He was not placed in a police vehicle and did not even accompany them to the station. He drove to the station in his own vehicle after first showering in his home.

On the second factor, while an interrogation at the police station is generally considered more "coercive" than when taking place in another location, *see State v. Schlitter*, 881 N.W.2d 380, 396 (Iowa 2016), this interview did not transform into a custodial interrogation at any point. Moreover, that the interview lasted three-and-a-half hours does not automatically transform the interview into custodial interrogation. *See Countryman*, 572 N.W.2d at 558. We consider the number of people conducting questioning, availability of breaks in questioning, and the manner of the questioning. *State v. Tyler*, 867 N.W.2d 136, 172 (Iowa 2015). In Alexander's case, only the plain-clothed special agent interviewed him. Alexander frequently laughed during the interview and took an unsupervised bathroom break. In *Tyler* our supreme court found there to be no custodial interrogation under similar facts to this case and where even more law enforcement personnel were present:

> Here, although the interrogation took place over the course of a three-hour period, the room in which it occurred was carpeted and well lit. Although the special agents who questioned [the defendant] were armed, they were dressed in plain clothes. During the questioning, only two special agents were present at any given time. In fact, for the majority of the questioning only [one] Special Agent . . . was present. At the start of the interview, [a] Special Agent . . . asked [the defendant] if she needed to go to the restroom and told her that if she needed anything to drink, to let them know.

*Id.* (internal citations omitted).

The third factor—the extent to which the defendant is confronted with evidence of his guilt—is the strongest factor in support of Alexander's argument. But at worst the special agent was confronting Alexander relating to inconsistencies in his own story. He confirmed to Alexander that there were allegations made against him. The special agent's suggestion that more evidence could be obtained or that the victim had made allegations against him, on their own, do not support a finding that Alexander was in custody.

And lastly, the fourth factor heavily weighs against custody. "The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *State v. Miranda*, 672 N.W.2d 753, 760 (Iowa 2003). Alexander was repeatedly told he was not under arrest and could freely walk out. The special agent informed Alexander, "You're free to go at any time," and if he walked down the hallway, "you're out of here."

Near the interview's halfway point, the special agent offered Alexander a restroom break and a drink. When Alexander suggested "you're keeping me a long time," the special agent confirmed, "Well, as long as you're okay with it." When Alexander suggested he needed to leave for a doctor appointment, the special agent said, "Okay." And after taking his restroom break, Alexander again requested confirmation that he was not under arrest and was "free to go anytime." The special agent again confirmed that Alexander would be "walking out of this police department." Any of the special agent's attempts to convince Alexander to stay to complete the interview are heavily outweighed by the multiple, explicit

statements confirming Alexander was free to leave at any time. During the interview the officer was not blocking Alexander's exit. Because Alexander was not in custody, his trial counsel committed no error in not moving to suppress that interview.

### B. Impermissible Vouching

Alexander next argues he received ineffective assistance of counsel, to his prejudice, when trial counsel failed to object to inadmissible vouching testimony. He complains that his trial counsel was ineffective because counsel did not object when the special agent and detective "testified repeatedly that they found [the victim] to be truthful, and that they believed her story."

We do not allow opinion testimony that vouches for or bolsters the credibility of another witness. *See State v. Dudley*, 856 N.W.2d 668, 676–77 (Iowa 2014) ("Our system of justice vests the jury with the function of evaluating a witness's credibility."). "Much of our case law has dealt with indirect vouching or bolstering, with experts being asked to provide statistics on how rarely children misreport sexual abuse, or by explaining if a complaining child's behavior is consistent with that of a victim's behavior." *State v. Gillson*, No. 15-2045, 2017 WL 2181176, at *3 (Iowa Ct. App. May 17, 2017).

But here, the special agent was asked directly why he questioned Alexander in the manner that he did. The prosecutor asked the special agent why he did not begin the interview by interrogating Alexander about the accusations and what factors would impact whether he starts an interrogation relating to the accusations. The special agent directly answered this line of questioning by clarifying that he

was going to conduct an interrogation no matter what because he believed the victim's story.

And on cross-examination Alexander's counsel directly asked the special agent if he believed the victim while inquiring into why it took so long to arrest Alexander.

> ALEXANDER'S COUNSEL: [O]n January 4th by that time you'd interviewed the accuser, are you saying that you weren't exactly sure that you believed all of her statements to you?
> SPECIAL AGENT: No, I absolutely believed her, but there's still some investigation that needs to be done. We needed to interview the defendant and see where he was going to go. And to be quite honest, I didn't know what he was going to admit to.

The special agent was also asked about his objective in interrogating a person:

> ALEXANDER'S COUNSEL: Is what you're looking for is an admission?
> SPECIAL AGENT: Correct.
> ALEXANDER'S COUNSEL: There's no question that that's what your goal was in this.
> SPECIAL AGENT: I'm looking to get to the truth.
> ALEXANDER'S COUNSEL: And but an admission, correct?
> SPECIAL AGENT: An admission to the truth.
> ALEXANDER'S COUNSEL: And again, it's an admission to the truth as you believe it based on your interview with the accuser, correct? Because you weren't there, you can't say what—you didn't witness any of these events, correct?
> SPECIAL AGENT: That's correct. I wasn't there for all those years.
> ALEXANDER'S COUNSEL: Okay. So it is the truth based on your investigation and your interview of the accuser, correct?
> SPECIAL AGENT: Correct.
> . . . .
> ALEXANDER'S COUNSEL: Okay. And so that that's what— why you wanted to establish the age of the accuser at the time that the alleged relationship initiated, correct?
> SPECIAL AGENT: Sure. I wanted to get to the truth.
> ALEXANDER'S COUNSEL: Okay. And again, it's the truth as you believe it based on your interviews with the accuser and other information you received from the police officers. Correct?
> SPECIAL AGENT: Yes.

The detective was also asked about his investigation following his conversation with the victim:

> ALEXANDER'S COUNSEL: After you spoke with her, what did you do?
> DETECTIVE: I wanted to try to corroborate as many of the statements as she told me as I could just to show that she was a truthful person.

In contrast to the typical vouching case, the detective and special agent were not expert witnesses opining on the victim's credibility. They only offered those credibility statements in direct response to questions asking them to explain the motive behind their investigative actions. *See, e.g.*, *State v. Newell*, 710 N.W.2d 6, 31–32 (Iowa 2006) (finding no improper bolstering where detective claimed he would believe a witness if their story was corroborated). It was not ineffective assistance of counsel for Alexander's counsel to pursue a trial strategy portraying law enforcement as biased for the victim. Moreover, his trial counsel testified in the first PCR case that he was aware of the prohibition on experts vouching for child sexual abuse victims and that he did not view that as occurring in this trial. "Improvident trial strategy, miscalculated tactics, and mistakes in judgment do not necessarily amount to ineffective assistance of counsel." *State v. McKettrick*, 480 N.W.2d 52, 55 (Iowa 1992).

Alexander's counsel was not ineffective in failing to object to the alleged vouching testimony.

## IV. Conclusion

Because Alexander's trial counsel was not ineffective, we affirm the district court's order denying his combined PCR application.

**AFFIRMED.**